MODIFIED OPINION

No. 94,254

STATE OF KANSAS, *Appellee*, v. DENNIS W. THOMPSON, *Appellant.*

(166 P.3d 1015)

Original opinion filed September 7, 2007. Modified opinion filed October 17, 2007.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Ty Kaufman*, county attorney, argued the cause, and *Phill Kline*, former attorney general, and *Paul J. Morrison*, attorney general, were with him on the briefs for appellee.

*Colin D. Wood*, special assistant attorney general, was on the brief for *amicus curiae* Kansas Highway Patrol.

The opinion of the court was delivered by

LUCKERT, J.: Dennis W. Thompson seeks to suppress evidence seized during warrantless searches of his vehicle and garage. Thompson consented to both searches after a law enforcement officer stopped Thompson for a traffic infraction, gave Thompson a verbal warning, told Thompson to have a nice day, and then asked whether Thompson would answer a few more questions. Thompson said "yes" to that initial question and, once again, when asked if the officer could search his vehicle. When evidence of drug use was discovered in the vehicle, Thompson was *Mirandized* and consented to a search of his garage.

Thompson argues evidence obtained during the warrantless searches should be suppressed because he was detained beyond the permissible scope of a traffic stop and did not voluntarily consent to the searches. The State argues the traffic detention ended before a request was made to search the vehicle, a voluntary encounter ensued, and Thompson voluntarily consented to both searches.

The trial court denied Thompson's motion to suppress, finding that Thompson was not seized at the time he consented to the

search of his vehicle and, therefore, his "Fourth Amendment rights do not come into play." On direct appeal in *State v. Thompson*, 36 Kan. App. 2d 252, 260-61, 138 P.3d 398 (2006), the Court of Appeals panel reversed, holding in part "that Thompson submitted to a claim of lawful authority rather than consented to a voluntary act."

We granted the State's petition for review in which the State argues the panel's decision is in "direct conflict" with decisions of the Tenth Circuit Court of Appeals and creates "an untenable situation for the uniform administration of justice and provides confusing and inconsistent rules for law enforcement." Also, the State argues the panel's reasoning misapplies decisions of the United States Supreme Court. The *amicus curiae* Kansas Highway Patrol raises similar concerns.

We conclude that under the totality of circumstances test developed by the United States Supreme Court and previously applied by this court, the traffic stop terminated and Thompson voluntarily consented to a continuation of the encounter and to the searches. We affirm the trial court and reverse the Court of Appeals on the single issue before us.

### FACTS AND PROCEDURAL HISTORY

On the night of May 26, 2004, Thompson was stopped within the city limits of McPherson after Officer Weinbrenner saw that Thompson's sport utility vehicle had a faulty headlight. Thompson pulled over in an alley, and the officer pulled in 10 or 15 feet behind him. The emergency lights on the police car remained activated. Weinbrenner asked for Thompson's driver's license and insurance documentation and then ran the license through police dispatch.

Meanwhile, as part of his routine during nighttime traffic stops, Weinbrenner called for a back-up officer to come to the location. Officer Michaels arrived as back-up and parked behind Officer Weinbrenner's patrol car. Officer Michaels did not approach Thompson's vehicle or have any direct contact with Thompson. Just before returning Thompson's driver's license to him, Officer Weinbrenner, while standing near the patrol cars and away from

Thompson, told Officer Michaels he was going to ask Thompson for consent to search his vehicle. Weinbrenner had information that Thompson had previously been involved with illegal drugs.

Then, Officer Weinbrenner returned Thompson's driver's license, issued a verbal warning, and told Thompson to have a nice day. Weinbrenner told the trial court that he started to walk away after issuing Thompson the warning but then returned within a second or two and asked, "By the way, can I ask you a few questions?"

The trial judge found that there was "no disengagement" before the officer asked for Thompson's consent to additional questioning:

"A careful viewing of the tape reveals that [the officer] did not leave the vicinity of the defendant after telling him to have a good day, but rather, immediately after the defendant had stated thank you to [the officer], he asked the defendant if he could ask him some additional questions. I do not believe there can be any question but that [the officer] did not disengage the defendant before asking his follow up questions."

The subsequent questioning resulted in Thompson saying Officer Weinbrenner could search his vehicle. When that search yielded assorted drug paraphernalia and a baggie containing a powder residue, Weinbrenner *Mirandized* Thompson and placed him under arrest. After indicating that the items came from his garage, Thompson subsequently granted authorities written permission to search his garage where numerous items of manufacturing paraphernalia were found.

The State charged Thompson with seven counts: (1) manufacture of methamphetamine in violation of K.S.A. 65-4159, a severity level 1 drug felony; (2) possession of ephedrine or pseudoephedrine as a precursor in violation of K.S.A. 65-7006(a), a severity level 1 drug felony; (3) possession of lithium metal as a precursor in violation of K.S.A. 65-7006(a), a severity level 1 drug felony; (4) possession of methamphetamine in violation of K.S.A. 2006 Supp. 65-4160, a severity level 4 drug felony; (5) possession of drug manufacturing paraphernalia in violation of K.S.A. 65-4152(a)(3), a severity level 4 drug felony; (6) possession of marijuana in violation of K.S.A. 65-4162(a)(3), a class A misdemeanor; and (7) possession

of drug use paraphernalia in violation of K.S.A. 65-4152(a)(2), a class A misdemeanor.

Before trial, Thompson filed a motion to suppress the evidence recovered from the search of his vehicle and garage, arguing that his consent was not voluntary. After hearing testimony, the trial court denied the motion. In reaching this conclusion, the judge examined the totality of the circumstances and found that Thompson had freely consented to the searches:

"[T]he encounter between Patrolman Weinbrenner and the defendant constituted a consensual encounter from and after the point in the stop that Patrolman Weinbrenner returned the driver[']s license to the defendant and told him to have a good day.

"In reaching this decision, I believe it is important that before asking additional questions: Patrolman Weinbrenner had returned the driver's license and other documentation to the defendant; the defendant was unaware of any other officers at the scene at the time he agreed to answer further questions; at no time during the stop did Patrolman Weinbrenner use coercive force or methods in dealing with the defendant; Patrolman Weinbrenner never displayed his weapon; never touched the defendant or his vehicle; and he never exhibited a tone of voice or attitude to the defendant that might lead a reasonable person to believe he could not leave the scene. Under these circumstances[,] I am satisfied that the defendant was not seized by Patrolman Weinbrenner at the time of the further questioning and therefore the defendant's Fourth Amendment rights do not come into play."

The jury found Thompson guilty of all seven counts as charged. The trial court sentenced him to a controlling term of 158 months' imprisonment on the primary offense of methamphetamine manufacture, a severity level 1 drug felony, and the remaining sentences were ordered to run concurrently.

Thompson appealed, raising several issues. The Court of Appeals panel agreed with Thompson's argument that the trial court erred in denying his motion to suppress evidence; the panel rejected Thompson's argument regarding sufficiency of the evidence and did not decide several other issues. Regarding the suppression issues, the panel concluded that Thompson submitted to a claim of lawful authority and determined that Thompson had no objective reason to believe that he was free to end his conversation with Officer Weinbrenner and drive away, even after the return of his driver's license. 36 Kan. App. 2d at 259-61.

A "paramount" consideration of the Court of Appeals panel was the trial court's express finding that there was "no disengagement" between the officer and Thompson. The panel commented that "the undetectability of any transition to a consensual encounter weighs heavily against an objective conclusion that the driver should believe that he or she was free to end the conversation and simply drive away, which is the touchstone of the proper analysis. [Citations omitted.]" 36 Kan. App. 2d at 259-60. In addition to the lack of "disengagement," the panel relied on the following factors in determining the encounter was not consensual: the officer expressed a prestop desire to seek consent to search Thompson's vehicle; the emergency lights of the patrol car remained activated when consent was given; and Thompson testified that he did not feel free to leave. 36 Kan. App. 2d at 260. In conclusion, the panel noted in part:

"At the heart of the Fourth Amendment is a strong requirement of specific justification for any intrusion upon protected personal liberty and security, coupled with a highly developed system of judicial controls to enforce the commands of our Constitution upon the agents of the State. Our court has experienced ever-increasing appeals with nearly identical fact patterns, indicating that there may be a perception in the field that a 'bright line rule' merely requires the return of documentation to cleanse additional questioning." 36 Kan. App. 2d at 261.

The case was reversed and remanded. 36 Kan. App. 2d at 261.

The State filed a petition seeking review of the Court of Appeals' ruling that the trial court erred in denying Thompson's motion to suppress. Thompson filed a cross-petition seeking review of the Court of Appeals' ruling that there was sufficient evidence to support his conviction for manufacture of methamphetamine. We granted the State's petition for review and denied Thompson's cross-petition. Therefore, the suppression of evidence will be the only issue considered. In broad terms, the determination of whether the evidence should be suppressed requires determination of whether Officer Weinbrenner's encounter with Thompson at the time consent was given was constitutionally permissible and whether Thompson's consent was voluntary.

## General Principles

When reviewing the trial court's denial of a defendant's suppression motion, appellate courts review the factual underpinnings using a substantial competent evidence standard. But the ultimate legal conclusion drawn from such facts is a question of law subject to de novo review. *State v. Jones,* 279 Kan. 71, 73, 106 P.3d 1 (2005); see *State v. Porting,* 281 Kan. 320, 324, 130 P.3d 1173 (2006). The State has the burden of proving that a search and seizure was lawful. *State v. Anderson,* 281 Kan. 896, 901, 136 P.3d 406 (2006); see *State v. Moore,* 283 Kan. 344, Syl. ¶ 1, 154 P.3d 1 (2007).

The Fourth Amendment to the United States Constitution and § 15 of the Kansas Constitution Bill of Rights assure each person's right to be secure in his or her person and property against unreasonable searches and seizures. Often, as in this case, an analysis of a motion to suppress will require examination of both the search and the seizure. Typically in such a dual issue case, determining the legality of the seizure is the first step of the analysis because the illegality of the detention can taint the consent and search. See *State v. Reason,* 263 Kan. 405, 415, 951 P.2d 538 (1997).

The question of whether there is a seizure arises in the context of one of four types of encounters with law enforcement officers: consensual encounters, which are not considered seizures; investigatory detentions, commonly known as *Terry* stops (see *Terry v. Ohio,* 392 U.S. 1, 18, 20 L. Ed. 2d 889, 88 S. Ct. 1868 [1968], and K.S.A. 22-2402); public safety stops; and arrests. *State v. Parker,* 282 Kan. 584, 588-89, 147 P.3d 115 (2006). The State argues that the encounter between Thompson and Officer Weinbrenner involved both an investigatory stop of the vehicle (detention) and, after the traffic stop ended, a consensual encounter.

As a general rule, all seizures must be reasonable, and the reasonableness of a seizure depends on the balance of the public interest and the individual's right to personal security free from arbitrary interference by law enforcement officers. *United States v. Brignoni-Ponce,* 422 U.S. 873, 878, 45 L. Ed. 2d 607, 95 S. Ct. 2574 (1975).

When it is alleged an investigatory traffic stop has turned into a consensual encounter, potential issues arise regarding the legality of: (1) the initial stop, *i.e.*, whether the officer's action was justified at its inception; (2) the detention, *i.e.*, whether the length and scope of the detention were reasonably related in scope to the circumstances which justified the interference in the first place; and (3) the continuation of the encounter beyond the point in time when the purpose of the traffic stop was fulfilled, *i.e.*, whether the continuation was consensual or the officer gained a reasonable and articulable suspicion of illegal activity. See *State v. Mitchell*, 265 Kan. 238, 241, 960 P.2d 200 (1998) (traffic stop an investigatory detention; reasonableness of investigative detention determined by whether officer's action was [1] justified at inception and [2] reasonably related in scope to the circumstances which justified interference in the first place); *Reason*, 263 Kan. at 410-13 (encounter was voluntary initially, became an investigatory detention based upon reasonable suspicion, and again became voluntary when defendant was advised he was free to go).

The principles that define the constitutionality of the first stage of the encounter—the initial act of stopping a moving vehicle—are well established. The usual traffic stop is viewed as more analogous to a "so called *'Terry stop'* than to a formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 439, 82 L. Ed. 2d 317, 104 S. Ct. 3138 (1984) (citing *Terry*, 392 U.S. 1). The stop is considered a seizure of the driver "even though the purpose of the stop is limited and the resulting detention quite brief." *Delaware v. Prouse*, 440 U.S. 648, 653, 59 L. Ed. 2d 660, 99 S. Ct. 1391 (1979); see *Whren v. United States*, 517 U.S. 806, 809-10, 135 L. Ed. 2d 89, 116 S. Ct. 1769 (1996); *State v. Hopper*, 260 Kan. 66, 69, 917 P.2d 872 (1996) (traffic stop always a seizure); K.S.A. 22-2402(1). Consequently, an officer must " 'have a reasonable and articulable suspicion, based on fact, that the person stopped has committed, is committing, or is about to commit a crime.' [Citation omitted.]" *State v. DeMarco*, 263 Kan. 727, 734, 952 P.2d 1276 (1998); see also *State v. McKeown*, 249 Kan. 506, 510, 819 P.2d 644 (1991) (traffic stop always constitutes a seizure and, therefore, officer must have articulable facts sufficient to constitute reasonable suspicion under K.S.A. 22-

2402 and *Terry*). Here, the officer observed a headlight infraction justifying the stop; Thompson does not argue otherwise.

Equally well established are principles regarding the second stage of the encounter—the permissible scope of the detention. In Kansas, a detention may not exceed the scope or duration necessary to carry out the purpose of the traffic stop. When conducting a routine traffic stop, an officer may request the driver's license and car registration, conduct a computer check, and issue a citation. *DeMarco*, 263 Kan. at 734; see also K.S.A. 22-2402 (officer may demand the person's name, address, and an explanation of the person's actions and may also frisk the person for weapons if necessary for the officer's personal safety). But *cf. Illinois v. Caballes*, 543 U.S. 405, 160 L. Ed. 2d 842, 125 S. Ct. 834 (2005) (drug sniff during traffic stop does not violate Fourth Amendment if it does not prolong stop).

If no information raising a reasonable and articulable suspicion of illegal activity is found during the time period necessary to perform the computer check and other tasks incident to a traffic stop, the motorist must be allowed to leave without further delay. *Mitchell*, 265 Kan. at 245; *City of Norton v. Stewart*, 31 Kan. App. 2d 645, 648, 70 P.3d 707 (2003). In *Mitchell*, for example, after the officer had confirmed the driver's license was valid and had shown the driver the radar reading, rather than write a citation, the officer began to question the driver about drugs. When the driver denied any current use of drugs, the officer asked, "Having that in mind, you wouldn't mind giving me permission to search the vehicle, then would you?" The driver refused permission to search, and the officer indicated he was going to call for a drug dog, which he did. This court invalidated the search, even though it was of short duration, as exceeding both the scope and temporal limits of a reasonable detention for a stop for speeding. 265 Kan. at 244-45.

Other cases suggest, however, that if the officer had terminated the traffic stop and then asked the questions about drug use, the analysis (at least to the point where the call was made for the drug dog) would require a determination of whether the encounter became consensual. For example, in *DeMarco*, after reiterating that "once the check confirms a proper license and entitlement to op-

erate the car, the driver must be allowed to proceed without further delay or questioning," the court added that further questioning is permissible if

" '(1) "the encounter between the officer and the driver ceases to be a detention, but becomes consensual, and the driver voluntarily consents to additional questioning," [citation omitted], or (2) during the traffic stop the officer gains a reasonable and articulable suspicion that the driver is engaged in illegal activity. [Citation omitted.]' [*United States v. Mendez*,] 118 F.3d [1426,] 1429-30 [(10th Cir. 1997)]." *DeMarco*, 263 Kan. at 734.

These two circumstances define the analysis of the third phase of the encounter—the continuation of the encounter after the purpose of the traffic stop is fulfilled.

There is no suggestion in this case the officer gained a reasonable and articulable suspicion that Thompson was engaged in illegal activity. Rather, the ultimate resolution of this case requires determination of whether, at the time the officer requested permission to search Thompson's vehicle, (1) the detention or seizure impermissibly extended beyond the scope of the purpose of the original stop and beyond the time necessary to accomplish that purpose or (2) the detention ended and there was a consensual encounter.

To determine if there is a seizure or a consensual encounter, the United States Supreme Court developed a "totality of the circumstances" test. The parameters, application, and purpose of this test will be discussed in more detail because application of the test determines the outcome of this appeal. Before engaging in that discussion, it is helpful to see how this piece of the puzzle fits into the entire analysis of our review of the motion to suppress. In summary, under the test, law enforcement interaction with a person is consensual, not a seizure if, under the totality of the circumstances, the law enforcement officer's conduct conveys to a reasonable person that he or she was free to refuse the requests or otherwise end the encounter. *State v. Lee*, 283 Kan. 771, 775, 156 P.3d 1284 (2007); *State v. Parker*, 282 Kan. 584, 589, 147 P.3d 115 (2006); *State v. Morris*, 276 Kan. 11, 19, 72 P.3d 570 (2003) (quoting *Florida v. Bostick*, 501 U.S. 429, 434, 115 L. Ed. 2d 389, 111 S. Ct. 2382 [1991]); *Reason*, 263 Kan. at 410; see *United States v.*

*Hernandez,* 93 F.3d 1493, 1498 (10th Cir. 1996). But see *Moore,* 283 Kan. at 352 (in automobile stop where location is controlled by police action of stopping vehicle, standard stated as being whether a reasonable person would feel "free to leave").

Appellate review of the trial court's determination of whether a reasonable person would feel free to refuse the officer's requests or otherwise terminate the encounter consists of two parts: (1) the factual underpinnings are reviewed under a substantial competent evidence standard and (2) the ultimate legal conclusion drawn from those facts, *i.e.,* whether a reasonable person would feel free to refuse the requests or to terminate the encounter, is reviewed under a de novo standard. See *Moore,* 283 Kan. at 352.

In addition to considering the nature of the seizure, when a search occurs the basis of the search must also be considered. See *United States v. Drayton,* 536 U.S. 194, 206-08, 153 L. Ed. 2d 242, 122 S. Ct. 2105 (2002) (considering separate issues of voluntariness of encounter and voluntariness of consent to search). A search conducted without a warrant is per se unreasonable unless it meets one of several recognized exceptions to the warrant requirement, including consent; search incident to a lawful arrest; stop and frisk; probable cause to search accompanied by exigent circumstances; the emergency doctrine; inventory searches; plain view; and administrative searches of closely regulated businesses. *State v. Drennan,* 278 Kan. 704, 719, 101 P.3d 1218 (2004). Consent is the only basis alleged by the State to justify the searches in this case.

For a consent to search to be valid, two conditions must be met: (1) There must be clear and positive testimony that consent was unequivocal, specific, and freely given and (2) the consent must have been given without duress or coercion, express or implied. See *United States v. Guerrero,* 472 F.3d 784, 789-90 (10th Cir. 2007); *Moore,* 283 Kan. at 360.

The State has the burden of establishing the scope and voluntariness of the consent to search. These questions present issues of fact which appellate courts review to determine if substantial competent evidence supports the trial court's findings. *Moore,* 283 Kan. at 360.

Finally, if it is determined there is any taint, we must determine whether the taint is purged. An unconstitutional seizure may infect or taint the consent to search as well as any fruits of the encounter if the nature of the seizure renders the consent to search involuntary. *Florida v. Royer*, 460 U.S. 491, 501, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983) (officer's detention of person beyond limited restraint of *Terry* investigative stop taints subsequent consent to search); see *Wong Sun v. United States*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963). Conversely, a voluntary consent to search can purge the primary taint of an illegal seizure. *Reason*, 263 Kan. at 409; *State v. Ninci*, 262 Kan. 21, 32, 936 P.2d 1364 (1997).

### ANALYSIS

In applying these principles to this case, because no issue is raised regarding the legality of the traffic stop, the analysis begins with the question of whether the traffic stop was extended beyond its lawful scope and duration or whether the encounter became consensual after Officer Weinbrenner returned Thompson's license and registration, advised Thompson he was giving him a warning, and told him to have a good day. The trial court applied the totality of the circumstances test developed by the United States Supreme Court and determined that the encounter had ended and became a consensual encounter. Yet, applying the same totality of the circumstances test, the Court of Appeals panel disagreed and concluded there was not a consensual encounter. 36 Kan. App. 2d at 259-61.

As the parties suggest, this divergence of opinion reflects the inherently factual nature of the inquiry. The factually driven inquiry means that the test is difficult to apply. This difficulty leads to imprecision which has led commentators to criticize the United States Supreme Court's consent search jurisprudence. Commentators, in addition to noting the difficulty in applying the case law relating to consensual searches to specific fact situations, argue that the Court's analysis utilizes an ill-crafted paradigm. See, *e.g.*, Williams, *Misplaced Angst: Another Look At Consent-Search Jurisprudence*, 82 Ind. L.J. 69, 69-71 (2007) ("No one seems to have a good word to say about consent-search jurisprudence"; it is a

"problematic realm of Fourth Amendment law."); Note, *The Fourth Amendment and Antidilution: Confronting the Overlooked Function of the Consent Search Doctrine*, 119 Harv. L. Rev. 2187, 2188 (2006) ("Most commentators agree that the Court's current approach is flawed, and even those commentators who defend the Court's holdings criticize its reasoning."); Simmons, *Not "Voluntary" But Still Reasonable: A New Paradigm for Understanding the Consent Searches Doctrine*, 80 Ind. L.J. 773, 773 (2005) (consent-search paradigm is a "triple inconsistency: the Court claims to be applying one test, but in reality is applying a different test—and neither test fully comports with the real-life confrontations"); Comment, *"People, Not Places": The Fiction of Consent, The Force of the Public Interest, and the Fallacy of Objectivity in Police Encounters with Passengers During Traffic Stops*, 7 U. Pa. J. Const. L. 1071, 1095 (2005) (because "[t]here is no such thing as a consensual encounter during a traffic stop," author argues "courts need a new standard"); LaFave, *The "Routine Traffic Stop" from Start to Finish: Too Much "Routine," Not Enough Fourth Amendment*, 102 Mich. L. Rev. 1843, 1898 (2004) (argues officers can "obviate any and all time and scope limitations" by performing "the well-known Lt. Columbo gambit ['one more thing . . .']" despite the reality that "any person who has been detained for a traffic violation is unlikely to so perceive the situation"); Chanenson, *Get the Facts, Jack! Empirical Research and the Changing Constitutional Landscape of Consent Searches*, 71 Tenn. L. Rev. 399, 402 (2004) ("[A]lthough scholars have criticized the consent search doctrine for years, the Supreme Court has steadfastly defended it and sided with a pro-law enforcement approach."); Whorf, *Consent Searches Following Routine Traffic Stops: The Troubled Jurisprudence of a Doomed Drug Interdiction Technique*, 28 Ohio N.U. L. Rev. 1, 7 (2001) ("coercion inherent" in consent searches after routine traffic stop "must be addressed in some way"); Butterfoss, *Bright Line Seizures: The Need for Clarity in Determining When Fourth Amendment Activity Begins*, 79 J. Crim. L. and Criminology 437, 481-82 (1988) (argues test utilized by United States Supreme Court is unworkable because outcomes of cases turn on subtle factual distinctions that make it difficult for police officers

to apply the standard in the field and adjust their conduct accordingly).

This criticism is valid in many respects. Because of the valid arguments raised, if we were to write on a clean slate, we would consider a different paradigm. We do not have this opportunity, however, because we are obligated to follow the United States Supreme Court's interpretation and application of the Fourth Amendment. *Mapp v. Ohio*, 367 U.S. 643, 655-57, 6 L. Ed. 2d 1081, 81 S. Ct. 1684, *reh. denied* 368 U.S. 871 (1961).

There is the option of construing our state constitution to provide greater protection of individual rights than mandated by the federal Constitution. See *Oregon v. Hass*, 420 U.S. 714, 719, 43 L. Ed. 2d 570, 95 S. Ct. 1215 (1975) ("a State is free as a matter of its own law to impose greater restrictions on police activity than those this Court holds to be necessary upon federal constitutional standards"). See generally Brennan, *The Bill of Rights and the States: The Revival of State Constitutions as Guardians of Individual Rights*, 61 N.Y.U. L. Rev. 535, 552 (1986). Critics of the United States Supreme Court's consent search jurisprudence, including justices, have urged or invited state courts to interpret their state constitutions broadly. See *Ohio v. Robinette*, 519 U.S. 33, 42, 136 L. Ed. 2d 347, 117 S. Ct. 417 (1996) (Ginsburg, J., concurring). Few states have accepted this invitation. See Whorf, 28 Ohio N.U. L. Rev. 1.

Kansas counts among the majority of states which have construed state constitutional provisions in a manner consistent with the United States Supreme Court's interpretation of the Fourth Amendment. In 1993, this court recognized that an analysis under § 15 of the Kansas Constitution Bill of Rights need not be in lockstep with the United States Supreme Court's interpretation of the Fourth Amendment to the United States Constitution, concluding that even though it followed United States Supreme Court decisions in that case it had authority "to interpret § 15 of the Kansas Constitution Bill of Rights independently of its federal counterpart and to heighten the protection available to Kansas citizens." *State v. Schultz*, 252 Kan. 819, 834, 850 P.2d 818 (1993). The fact the court did not depart from the United States Supreme Court's anal-

ysis in that case did "not foreclose the possibility of" diverging from Fourth Amendment jurisprudence "in a future case involving different issues." 252 Kan. at 834. Two Kansas justices dissented and would have read § 15 of the Kansas Constitution Bill of Rights to provide greater protection than the Fourth Amendment. Yet, later that year in an opinion authored by one of the *Schultz* dissenters, the court wrote that the Fourth Amendment and § 15 of the Kansas Constitution Bill of Rights "are identical for all practical purposes. If conduct is prohibited by one it is prohibited by the other." *State v. Johnson*, 253 Kan. 356, 362, 856 P.2d 134 (1993) (citing *Schultz*, 252 Kan. at 824).

Before *Schultz*, the court typically stated that the scope of § 15 of the Kansas Constitution Bill of Rights "is identical" or "is usually" identical to the scope of the Fourth Amendment to the United States Constitution. Compare *State v. LeFort*, 248 Kan. 332, 334, 806 P.2d 986 (1991) ("is identical"), and *State v. Deskins*, 234 Kan. 529, Syl. ¶ 1, 673 P.2d 1174 (1983) (scope "is identical" in "any particular factual situation"), with *State v. Lambert*, 238 Kan. 444, 446, 710 P.2d 693 (1985) ("is usually considered to be identical"), and *State v. Fortune*, 236 Kan. 248, Syl. ¶ 1, 689 P.2d 1196 (1984) (same). Recently, in the specific context of analyzing the voluntariness of a consent to search following a traffic stop, we concluded the Fourth Amendment and § 15 of the Kansas Constitution Bill of Rights provided "identical protection." *Moore*, 283 Kan. at 349; see also *State v. Hoeck*, 284 Kan. 441, Syl. ¶ 2, 163 P.3d 252 (2007) (considering good faith exception when warrant issued without sufficient probable cause); *Anderson*, 281 Kan. at 901 (extended detention after traffic stop based upon reasonable suspicion).

Hence, decisions of the United States Supreme Court frame our analysis. The State and *amicus curiae* argue the Court of Appeals panel misapplied those cases. Specifically, they argue the Court of Appeals panel deviated from applicable precedent relating to consensual searches in: (1) finding that the extended traffic stop was not consensual and in determining that the lack of physical disengagement between Thompson and the officer was a "paramount" consideration leading to this determination; (2) considering the officer's prestop intent to seek Thompson's consent to

search the vehicle; (3) considering the fact that the patrol car's emergency lights continued to flash throughout the stop; and (4) ruling that Thompson's subjective state of mind was relevant in determining whether the police encounter was consensual.

Because several decisions of the United States Supreme Court touch on all of these arguments and because the fact-driven analysis means that the facts underlying each decision must be considered, we will discuss the relevant Supreme Court cases before discussing the parties' arguments.

### United States Supreme Court Cases

The totality of the circumstances test derives from *Schneckloth v. Bustamonte*, 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973), a case in which the test was applied to determine the voluntariness of a consent to search. *Bustamonte* arose from a traffic stop that occurred after officers observed a car with a burned-out headlight and license plate light. Six men were in the vehicle, including Bustamonte. After the six occupants stepped out of the car at the officer's request and two additional police officer arrived, an officer asked if he could search the car. One of the passengers, who advised that the car belonged to his absent brother, replied, "Sure, go ahead." The encounter " 'was all very congenial at this time.' " 412 U.S. at 220. Officers found stolen checks in the car, and the occupants were arrested.

Bustamonte filed a motion to suppress, the motion was denied, and he was convicted. Subsequently, Bustamonte filed a habeas corpus petition which the district court denied. The Ninth Circuit Court of Appeals reversed, holding that a " 'court must determine from all the circumstances whether the verbal assent [to a search] reflected an understanding, uncoerced, and unequivocal election to grant the officers a license which the person knows may be freely and effectively withheld.' [Citation omitted.]" *Bustamonte v. Schneckloth*, 448 F.2d 699, 700 (9th Cir. 1971), *rev'd Schneckloth v. Bustamonte*, 412 U.S. 218. The Ninth Circuit deemed the consent invalid because the district court had not found that the consenting suspect knew he had the right to refuse consent. The federal appellate court also noted that "[u]nder the circumstances a

reasonable person might read an officer's 'May I' as the courteous expression of a demand backed by force of law." *Bustamonte,* 448 F.2d at 701.

On appeal from that decision, the United States Supreme Court identified the "precise question" presented in the case as: "What must the prosecution prove to demonstrate that a consent was 'voluntarily' given?" *Bustamonte,* 412 U.S. at 223. Searching for a standard to answer that question, the Court turned to its cases regarding the voluntariness of a confession.

By importing the standards for confession into consent jurisprudence, the Court brought the focus to coercion or the lack thereof. The Court noted that the test is whether the confession (or, by extension, the consent) is the product of an essentially free and unconstrained choice by its maker. " 'If it is, if he has willed to confess, it may be used against him. If it is not, if his will has been overborne and his capacity for self-determination critically impaired,' " the evidence may not be used against the defendant. 412 U.S. at 225. The Court justified the standard by noting that "two competing concerns must be accommodated in determining the meaning of a 'voluntary' consent—the legitimate need for such searches and the equally important requirement of assuring the absence of coercion." 412 U.S. at 227.

The Court observed that "consent" in the context of voluntariness of confessions differs from traditional notions of "consent," noting the term "cannot be taken literally to mean a 'knowing' choice." 412 U.S. at 224. Nor does the concept of voluntariness incorporate " 'notions of "but for" cause' " because " 'very few people give incriminating statements in the absence of official action of some kind.' It is thus evident that neither linguistics nor epistemology will provide a ready definition of the meaning of 'voluntariness.' " 412 U.S. at 224.

Instead, the Court crafted a notion of consent premised upon the coercion standard the Court had adopted, stating that "[i]n determining whether a defendant's will was overborne in a particular case," a court must assess "the totality of all the surrounding circumstances." 412 U.S. at 226. The Court emphasized that the outcome does not turn on the presence or absence of "a single

controlling" or "infallible touchstone" and requires "careful scrutiny of all the surrounding circumstances." 412 U.S. at 226, 229.

Consistent with the rejection of any per se or bright-line tests, the Court did not adopt the suggestion that police should have to warn a person of the right to refuse consent. In part, the Court rejected the requirement because "it would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning." 412 U.S. at 231. The Court also rejected a requirement that there be a formal "waiver" of rights. The Court recognized that without a requirement of a warning of the right to refuse consent or of an explicit waiver of that right, the State would have a difficult, if not impossible, burden if required to prove knowledge of the right to refuse consent. Therefore, the Court rejected the Ninth Circuit Court of Appeals' holding, stating that "[i]ts ruling, that the State must affirmatively prove that the subject of the search knew that he had a right to refuse consent, would, in practice, create serious doubt whether consent searches could continue to be conducted." *Bustamonte*, 412 U.S. at 229.

Rather, the Court emphasized the critical analysis is whether the defendant was coerced, stating for example: "[W]hether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances," and "two competing concerns must be accommodated in determining the meaning of a 'voluntary' consent—the legitimate need for such searches and the equally important requirement of assuring the absence of coercion." 412 U.S. at 227.

The Court concluded the opinion by stating:

"Our decision today is a narrow one. We hold only that *when the subject of a search is not in custody* and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances, and while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent." (Emphasis added.) 412 U.S. at 248-49.

The case did not address whether there was a seizure even though Bustamonte and his fellow passengers had been removed from their vehicle and were in the presence of several officers when a consent to search was requested. Apparently, the Court did not believe there was a seizure because the holding, as shown in the language emphasized in the preceding quotation, was limited to situations "when the subject of a search is not in custody." 412 U.S. at 248.

It would be 23 years before the United States Supreme Court again addressed a consensual search in the context of a traffic stop. In the intervening years, however, the Court decided several consent search cases. These cases are important to the consideration of the "seizure" aspect of the analysis. In these cases, the Court adapted the totality of the circumstances test to the question of whether an encounter was consensual.

In *United States v. Mendenhall*, 446 U.S. 544, 552, 64 L. Ed. 2d 497, 100 S. Ct. 1870, *reh. denied* 448 U.S. 908 (1980), Mendenhall was walking along an airport concourse when she was approached by two federal Drug Enforcement Agency (DEA) officers. The DEA officers asked for Mendenhall's airline ticket and some identification. The name on the ticket and identification did not match. When one of the agents specifically identified himself as a federal narcotics agent, Mendenhall became visibly shaken and nervous. After returning the ticket and identification, the agent asked Mendenhall if she would accompany him to the DEA airport office, 50 feet away, for further questions. Once in the office, Mendenhall was asked to consent to a search of her person and her handbag; she was advised of her right to decline. Mendenhall consented and, as the search began, handed over two bags of heroin.

The Sixth Circuit Court of Appeals held that the initial stop and the request to accompany agents to the room were both impermissible seizures. *United States v. Mendenhall*, 596 F.2d 706 (6th Cir. 1979). The United States Supreme Court reversed in a plurality decision. *Mendenhall*, 544 U.S. at 546. Two justices viewed the entire encounter as consensual, concluding there was not a seizure. Three other justices assumed there had been a seizure but would have held that there was reasonable suspicion to warrant it;

hence a voluntary consent to search was a valid basis for the search. Thus, the five justices voting to reverse the Sixth Circuit appear to have agreed that Mendenhall was not being illegally detained when she consented to be searched. The four dissenting justices assumed that there had been a detention but were of the view that reasonable grounds for suspecting Mendenhall did not exist and concluded that Mendenhall was thus being illegally detained at the time of her consent.

In the principal opinion, Justice Stewart, in considering whether there had been a seizure, cited *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), and reiterated: " 'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.' " *Mendenhall*, 446 U.S. at 552. Justice Stewart added to the test, stating:

"We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled. [Citations omitted.]" 446 U.S. at 554.

The test in Justice Stewart's principal opinion in *Mendenhall* was adopted in the majority opinions in *Michigan v. Chesternut*, 486 U.S. 567, 573, 100 L. Ed. 2d 565, 108 S. Ct. 1975 (1988), and *INS v. Delgado*, 466 U.S. 210, 215, 80 L. Ed. 2d 247, 104 S. Ct. 1758 (1984). *Delgado* also clarified that "police questioning, by itself, is unlikely to result in a Fourth Amendment violation." 466 U.S. at 216. Unless the surrounding conditions "are so intimidating as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment." 466 U.S. at 216. Essentially under these cases, "[a]s long as the person to whom the questions are put remains free to disregard the questions . . . there has been no intrusion upon that person's liberty or privacy as would under the Constitution require

some particular and objective justification." *Mendenhall*, 446 U.S. at 554.

Three years after the decision in *Mendenhall*, the United States Supreme Court considered another airport encounter between law enforcement officers and an individual. Once again the focus of the Court's analysis was whether there was a seizure. In *Florida v. Royer*, 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983), the defendant was stopped in an airport, questioned, then asked to come into a nearby room where he was asked for consent to search his bags. First, the Court stated that "where the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority. [Citations omitted.]" 460 U.S. at 497. Next, the Court addressed whether there was a permissible seizure and concluded the initial encounter was a permissible *Terry* stop. The officers exceeded the scope of a *Terry* stop, however, when they advised the defendant he was suspected of trafficking drugs and, while in possession of his airline ticket and driver's license, asked him to accompany them to a room. Royer then learned that, without his permission, officers had retrieved his checked luggage from the airplane. The Court concluded those "circumstances surely amount to a show of official authority such that 'a reasonable person would have believed he was not free to leave.' [Citation omitted.]" *Royer*, 460 U.S. at 502. The justices distinguished *Mendenhall* by noting that Mendenhall's airline ticket and identification had been returned, her luggage had not been seized, and she was advised she did not have to consent. 460 U.S. at 503 n.9.

The *Royer* majority recognized the fact-intensive nature of the two decisions, stating:

"We do not suggest that there is a litmus-paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop. Even in the discrete category of airport encounters, there will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment." 460 U.S. at 506-07.

The conclusion that the inquiry is exceedingly fact-intensive was reinforced when, with little analysis, the Court in *Florida v. Rodriguez*, 469 U.S. 1, 5-6, 83 L. Ed. 2d 165, 105 S. Ct. 308 (1984), concluded that, where officers asked the defendant to step to the side of an airport concourse and talk to them, the exchange "was clearly the sort of consensual encounter that implicates no Fourth Amendment interest."

In the next significant consent case considered by the Court, the focus, once again, was whether there was a seizure. In *Florida v. Bostick*, 501 U.S. 429, 436-38, 115 L. Ed. 2d 389, 111 S. Ct. 2382 (1991), Bostick was questioned when two armed officers, displaying badges and insignia, boarded a common-carrier bus during a scheduled stop. The officers approached Bostick and asked to see his bus ticket and identification. The officers returned the identification and asked if they could search his luggage. They advised him he could refuse, but he consented.

Bostick argued that no reasonable person would feel free to leave in a situation where police officers towered over a seated passenger, the passenger's movement was restrained by the physical characteristics of a bus, and the passenger had no realistic option to disembark the bus that was about to leave because to do so would result in being stranded and having to abandon luggage stored in the bus' luggage compartment. The Florida Supreme Court was persuaded by the argument and adopted a per se rule prohibiting police from randomly boarding buses for drug interdiction. *Bostick v. State*, 554 So. 2d 1153, 1154-57 (Fla. 1989).

The United States Supreme Court reversed, stating: "The state court erred, however, in focusing on whether Bostick was 'free to leave' rather than on the principle that those words were intended to capture." *Bostick*, 501 U.S. at 435. The Court explained that the focus should be on the police officers' actions, not whether the place of the seizure restricted freedom. "Bostick's movements were 'confined' in a sense, but this was the natural result of his decision to take the bus; it says nothing about whether or not the police conduct at issue was coercive." 501 U.S. at 436; see also *Delgado*, 466 U.S. at 216 (factory workers were not seized when INS agents

approached workers; constraint on freedom to leave was because of workplace environment, not officers' conduct).

The Court discussed when a seizure would occur, stating:

"Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions. So long as a reasonable person would feel free 'to disregard the police and go about his business,' [citation omitted], the encounter is consensual and no reasonable suspicion is required. The encounter will not trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Bostick*, 501 U.S. at 434.

The Court also rejected Bostick's argument that there was a seizure because no reasonable person would freely consent to a search of luggage that he or she knows contains drugs. 501 U.S. at 437-38. The Court stated: "This argument cannot prevail because the 'reasonable person' test presupposes an innocent person." 501 at U.S. 438. Additionally, the Court stated that no seizure occurs "as long as the police do not convey a message that compliance with their requests is required." 501 U.S. at 435. The Court concluded its opinion, stating:

"We adhere to the rule that, in order to determine whether a particular encounter constitutes a seizure, a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." 501 U.S. at 439.

The United States Supreme Court considered another drug interdiction occurring on a bus in *United States v. Drayton*, 536 U.S. 194, 153 L. Ed. 2d 242, 122 S. Ct. 2105 (2002). At a scheduled stop, an officer boarded a Greyhound bus and asked Drayton and his traveling companion for consent to a search of their bags and their persons. Drayton's companion consented, and police found packages of cocaine strapped to the passenger's legs. Then, an officer asked Drayton, "Mind if I check you?" Drayton responded by lifting his hands about 8 inches from his legs. The police searched him and found cocaine. Both men attempted to suppress the evidence. The district court found the exchange to be "cooperative" and denied the motions. The Eleventh Circuit Court of Appeals reversed, emphasizing that within the confines of a bus the passengers would not feel free to disregard police requests

without the police informing the passengers that they were not required to consent. *United States v. Drayton*, 231 F.3d 787 (11th Cir. 2000).

On review of the decision, the United States Supreme Court first addressed whether there was a seizure. To make that determination the Court stated: "The proper inquiry 'is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter.' " *Drayton*, 536 U.S. at 202. The Court concluded there had not been a seizure, noting "there 'was nothing coercive [or] confrontational' about the encounter. There was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no blocking of exits, no threat, no command, not even an authoritative tone of voice." 536 U.S. at 204.

After this discussion, the Court turned "from the question whether respondents were seized to whether they were subjected to an unreasonable search, *i.e.*, whether their consent to the suspicionless search was involuntary." 536 U.S. at 206. The Court did not say that the analysis of this issue was based upon the same test. It did, however, note: "In circumstances such as these, where the question of voluntariness pervades both the search and seizure inquiries, the respective analyses turn on very similar facts. And, as the facts above suggest, respondents' consent to the search of their luggage and their persons was voluntary." 536 U.S. at 206.

The *Drayton* Court then emphasized the competing interests underlying the use of consent as a basis for searches, reiterated that notice of the right to refuse consent was not required, discussed the totality of the circumstances test, and emphasized the lack of coercion, stating:

"In a society based on law, the concept of agreement and consent should be given a weight and dignity of its own. Police officers act in full accord with the law when they ask citizens for consent. It reinforces the rule of law for the citizen to advise the police of his or her wishes and for the police to act in reliance on that understanding. When this exchange takes place, it dispels inferences of coercion." 536 U.S. at 207.

The analysis in *Drayton* preserves two separate issues which arguably had been blurred in some of the other decisions of the

Court, clarifying that the analysis requires considering whether (1) there is a seizure or a voluntary encounter and (2) whether the consent to search is voluntary.

Recently, in addressing whether a passenger in a vehicle is seized when officers stop a vehicle, the Court summarized these and other cases, stating:

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, ' "by means of physical force or show of authority," ' terminates or restrains his freedom of movement, *Florida v. Bostick*, 501 U.S. 429, 434, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991) (quoting *Terry v. Ohio*, 392 U.S. 1, 19, n.16, 88 S. Ct. 1868, 20 L. Ed. 2d 889 [1968]), *'through means intentionally applied,' Brower v. County of Inyo*, 489 U.S. 593, 597, 109 S. Ct. 1378, 103 L. Ed. 2d 628 (1989). . . . A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned. See *California v. Hodari D.*, 499 U.S. 621, 626, n.2, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991); [*County of Sacramento v.*] *Lewis*, [523 U.S. 833,] 844, 845, n.7, 118 S. Ct. 1708, 140 L. Ed. 2d 1043 [(1998)].

"When the actions of the police do not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence, there needs to be some test for telling when a seizure occurs in response to authority, and when it does not. The test was devised by Justice Stewart *in United States v. Mendenhall*, 446 U.S. 544, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980), who wrote that a seizure occurs if 'in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave,' *id.*, at 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (principal opinion). Later on, the Court adopted Justice Stewart's touchstone, see, *e.g., Hodari D., supra*, at 627, 111 S. Ct. 1547, 113 L. Ed. 2d 690; *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S. Ct. 1975, 100 L. Ed. 2d 565 (1988); *INS v. Delgado*, 466 U.S. 210, 215, 104 S. Ct. 1758, 80 L. Ed. 2d 247 (1984), but added that when a person 'has no desire to leave' for reasons unrelated to the police presence, the 'coercive effect of the encounter' can be measured better by asking whether 'a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter,' *Bostick, supra*, at 435-436, 111 S. Ct. 2382, 115 L. Ed. 2d 389; see also *United States v. Drayton*, 536 U.S. 194, 202, 122 S. Ct. 2105, 153 L. Ed. 2d 242 (2002)." *Brendlin v. California*, 551 U.S. 249, 254-55, 168 L. Ed. 2d 132, 138, 127 S. Ct. 2400 (2007).

The *Brendlin* Court held a passenger is seized when an officer pulls over a particular car because, in doing so, the officer "acts with an implicit claim of right based on fault of some sort, and a

sensible person would not expect a police officer to allow people to come and go freely from the physical focal point of an investigation into faulty behavior or wrongdoing." 551 U.S. at 257. During that "physical focal point of an investigation," the Court noted there exists a societal expectation of " ' "unquestioned [police] command" ' at odds with any notion that a passenger would feel free to leave, or to terminate the personal encounter any other way, without advance permission. [Citation omitted.]" 551 U.S. at 258. The Court did not offer, however, any insight into the parameters of the "physical focal point of an investigation."

### Robinette: Ohio and United States Supreme Courts

Between *Bostick* and *Drayton*, the Court decided *Ohio v. Robinette*, 519 U.S. 33, 136 L. Ed. 2d 347, 117 S. Ct. 417 (1996), and the Court revisited the issues surrounding a consensual search in the *Bustamonte* factual situation of an extended traffic stop.

Robinette had been stopped for speeding in Ohio. The officer asked Robinette to step out of the car, gave a verbal warning, and returned Robinette's driver's license. Then the officer said, "One question before you get gone [*sic*]: are you carrying any illegal contraband in your car? Any weapons of any kind, drugs, anything like that?" 519 U.S. at 35-36. After Robinette said "no," the officer asked if he could search the car, and Robinette said he could. Drugs were found, and Robinette was charged and convicted based upon the evidence seized. The Ohio Court of Appeals reversed, finding the detention unlawful. The Ohio Supreme Court affirmed, holding:

"The transition between detention and a consensual exchange can be so seamless that the untrained eye may not notice that it has occurred. The undetectability of that transition may be used by police officers to coerce citizens into answering questions that they need not answer, or to allow a search of a vehicle that they are not legally obligated to allow.

"The present case offers an example of the blurring between a legal detention and an attempt at consensual interaction. . . .

"Most people believe that they are validly in a police officer's custody as long as the officer continues to interrogate them. The police officer retains the upper hand and the accouterments of authority. That the officer lacks legal license to continue to detain them is unknown to most citizens, and a reasonable person

would not feel free to walk away as the officer continues to address him." *State v. Robinette,* 73 Ohio St. 3d 650, 654-55, 653 N.E.2d 695 (1995) (*Robinette I*).

To assure that citizens were aware they could refuse consent, the Ohio Supreme Court imposed a bright-line test, further holding: "Any attempt at consensual interrogation must be preceded by the phrase 'At this time you legally are free to go' or by words of similar import." *Robinette I,* 73 Ohio St. 3d at 655.

On review of the Ohio Supreme Court's decision, the United States Supreme Court considered only the last portion of this holding, stating the specific question before it was "whether the Fourth Amendment requires that a lawfully seized defendant must be advised that he is 'free to go' before his consent to search will be recognized as voluntary." *Ohio v. Robinette,* 519 U.S. at 35 (*Robinette II*). The Supreme Court rejected the Ohio court's requirement, noting it has "consistently eschewed bright-line rules" in the Fourth Amendment context. 519 U.S. at 39. The Court reiterated that a totality of the circumstances test applied but, without mentioning the objective considerations included in the *Bustamonte* test, limited consideration to objective circumstances.

The Court noted: "We have long held that the 'touchstone of the Fourth Amendment is reasonableness.' [Citation omitted.] Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Robinette II,* 519 U.S. at 39. Citing back to *Bustamonte,* the Court noted that warnings were not required and concluded that "just as it 'would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning,' [citation omitted,] so too would it be unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary." *Robinette II,* 519 U.S. at 39-40.

The *Robinette II* decision is significant not only for what was stated but also for what was not. First, as noted, the language quoted above clearly indicates the Court's silent abandonment of the *Bustamonte* subjective factors to determine what a reasonable person would believe. Additionally, the Court did not address the primary issue raised by the Ohio Supreme Court in *Robinette I*:

the blurring of the transition from detention to consensual encounter. See 4 LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 9.3(g), p. 404 (4th ed. 2004) (*Robinette II* Court decided a "question which was really not in the *Robinette* [*I*] case" and "managed to avoid entirely the important issue the state court *had* taken on: whether a traffic offender somehow becomes 'unseized' upon return of his license notwithstanding a continuation (albeit on a different subject) of police discussion with the stopped driver."); Dery, *"When Will This Traffic Stop End": The United States Supreme Court's Dodge of Every Detained Motorists Central Concern—Ohio v. Robinette*, 25 Fla. St. U. L. Rev. 519, 565 (1998) ("The crucial issue missed in *Robinette* [*II*] dealt not with the resulting consent, but with the continuing seizure. By failing to target the correct question, the Court missed the opportunity to clarify an area of the law suffering from uncertainty.").

On remand, the Ohio Supreme Court once again focused upon the issue the United States Supreme Court had not addressed and reaffirmed its prior conclusion that the extended detention was illegal and tainted the consent. *State v. Robinette*, 80 Ohio St. 3d 234, 244-45, 685 N.E.2d 762 (1997) (*Robinette III*). The *Robinette III* court found that the officer "was not justified in detaining Robinette in order to ask for and execute an intrusive search." 80 Ohio St. 3d at 241. Applying *Florida v. Royer*, 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983), the court reasoned that "police officers, under certain circumstances, may briefly detain an individual without reasonably articulable facts giving rise to suspicion of criminal activity, if the detention promotes a legitimate public concern, *e.g.*, removing drunk drivers from public roadways or reducing drug trade." *Robinette III*, 80 Ohio St. 3d at 241. Asking Robinette whether he had any weapons or drugs, legitimately "promotes the public interest of quelling the drug trade." 80 Ohio St. 3d at 241. When Robinette's answer to that question did not provide any reasonably articulable facts or individualized suspicion, the officer was not justified in detaining Robinette any longer according to the Ohio court's reasoning. 80 Ohio St. 3d at 241.

Thus, *Robinette III* concluded the detention was illegal but added: "Even though we have determined that [the officer] unlaw-

fully detained Robinette to ask for permission to search his car, our analysis is not complete. Voluntary consent, determined under the totality of the circumstances, may validate an otherwise illegal detention and search." 80 Ohio St. 3d at 241. The court declined to utilize the same analysis it had in *Robinette I*, stating: "Robinette argues that retention of *Robinette I* 's 'free to go' rule would provide predictability in determining whether an individual consented to a search. We find that Robinette's conclusion is based on an oversimplified approach to the issue of consent." *Robinette III*, 80 Ohio St. 3d at 241.

Rather, the *Robinette III* court relied upon *Bustamonte*'s totality of the circumstances analysis and applied the test to determine whether the consent to search was voluntary. *Robinette III* cited several factors leading to the conclusion that Robinette did not voluntarily consent to the search. First, the court noted that the officer's words to Robinette implied that Robinette was not free to refuse to answer the officer's request because the officer prefaced his question by saying, "One question before you get gone [*sic*]: are you carrying any illegal contraband . . .?" 80 Ohio St. 3d at 243-44. Second, the court found the immediate transition troubling. The court repeated what it had said in *Robinette I* regarding the seamless transition between detention and consensual exchange and again expressed the view that the blurring of the transition can be a type of coercion used by police. Where the *Robinette I* court applied this concern in the context of determining whether Robinette was seized, *i.e.*, whether the encounter was consensual, the *Robinette III* court did so in the context of determining if the search consent was voluntary, *i.e.*, whether the search was consensual. 80 Ohio St. 3d at 244.

To those concerns the *Robinette III* court added:

"When these factors are combined with a police officer's superior position of authority, any reasonable person would have felt compelled to submit to the officer's questioning. While [the officer's] questioning was not expressly coercive, the circumstances surrounding the request to search made the questioning impliedly coercive. . . . From the totality of the circumstances, it appears that Robinette merely submitted to 'a claim of lawful authority' rather than consenting as a voluntary act of free will. Under *Royer*, this is not sufficient to prove voluntary

compliance. *Royer*, 460 U.S. at 497, 103 S. Ct. at 1324, 75 L. Ed. 2d at 236" *Robinette III*, 80 Ohio St. 3d at 244-45.

In essence, the court considered the illegality of the detention, the officer's statement that he had a question before Robinette was on his way, the lack of transition, and the officer's position of authority as circumstances weighing against voluntariness of the consent to search. 80 Ohio St. 3d at 241, 244-46.

### Application of Robinette

In this case, the Court of Appeals panel relied upon *Robinette III* in determining the nature of the extended traffic stop. Based largely upon the Ohio court's discussion of the coercive effect of a blurred transition between a detention and a consensual encounter, the panel concluded:

"Where, as here, the district court has expressly found that there was 'no disengagement' by the officer between the return of documentation and the additional questioning, we conclude that the undetectability of any transition to a consensual encounter weighs heavily against an objective conclusion that the driver should believe that he or she was free to end the conversation and simply drive away, which is the touchstone of the proper analysis. [Citations omitted.]" *Thompson*, 36 Kan. App. 2d at 259-60.

Thompson argues this conclusion is appropriate because the traffic stop must have ended; otherwise, Thompson was still detained. While this is true, both Thompson and the Court of Appeals failed to discuss the distinctions between the Ohio court's analysis and that traditionally employed in Kansas cases. As explained by one Ohio appellate court decision:

"In [*Robinette III*], the Ohio Supreme Court drew a firm line marking the boundaries of a seizure permitted incident to a traffic stop. Where a person is detained pursuant to a traffic stop beyond the time required for the stop itself, and that continued stop is not based upon any articulable facts giving rise to a suspicion of some illegal activity justifying the extension of the detention, the continued detention to conduct a search constitutes an illegal seizure." *State v. Huth*, 163 Ohio App. 3d 102, 107, 836 N.E.2d 623 (2005).

In other words, the *Robinette III* court treated the stop as a continuing detention that became unlawful when the *Terry*-stop type question did not lead immediately to a reasonable suspicion

of illegal activity. This analysis was a shift in the same court's analysis in *Robinette I*. In the first case, the Ohio Supreme Court held that the lawful detention ended immediately after the officer returned to Robinette's car upon completing the computer inquiry. At that point, "every aspect of the speeding violation had been investigated and resolved. All [the deputy] had to do was to issue his warning and return Robinette's driver's license." *Robinette I*, 73 Ohio St. 3d at 653. The United States Supreme Court later rejected this analysis, but it did so only to the extent of pointing out that the stop continued when Robinette was ordered out of his car. *Robinette II*, 519 U.S. at 38-39. The Court did not say that the detention never terminated, it just rejected the termination point identified by the Ohio court. Thus, the United States Supreme Court did not clearly eliminate

"the possibility of an analytical division of the overall police/citizen interaction into two separate, successive encounters, but merely as moving the endpoint of the initial lawful detention to the later point when [the officer] administered traffic warnings and returned Robinette's driver's documentation. Reading *Robinette II* in this manner aids in squaring the decision with our own jurisprudence, as well as the United States Supreme Court's prior decisional law." *Com. v. Strickler*, 563 Pa. 47, 70, 757 A.2d 884 (2000).

Certainly, as the critics of *Robinette II* suggest, the interpretation is subject to debate. Regardless, without explicitly entering into the debate, this court has adopted the approach of recognizing the possibility of two separate, successive encounters—one a detention and one voluntary. Hence, the conclusion of the Pennsylvania Supreme Court in *Strickler* applies in Kansas as well, and the Ohio Supreme Court's analysis in *Robinette III* does not square with Kansas' interpretation of *Robinette II* and other United States Supreme Court cases, especially *Schneckloth v. Bustamonte*, 412 U.S. 218, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973).

In Kansas, the possibility of a termination of the detention followed by a successive, second encounter was recognized first in dicta in *State v. McKeown*, 249 Kan. 506, 510, 819 P.2d 644 (1991), and then in *State v. DeMarco*, 263 Kan. 727, 734, 952 P.2d 1276 (1998), when the court stated that upon completion of the computer check and issuance of a citation or warning, the driver must

be allowed to leave unless reasonable suspicion had developed or the driver consented to additional questioning.

The concept was applied in *State v. Reason*, 263 Kan. 405, 951 P.2d 538 (1997). In *Reason*, two police officers approached two individuals sleeping inside a vehicle with open doors and parked in a public lot. After wakening Reason to assure he was not hurt or ill, the officers requested identification. The court concluded this portion of the encounter was a voluntary encounter. The encounter became investigatory, however, when Reason informed the officers he did not have any identification as his wallet had been stolen. The officers ran a check on the vehicle's identification number, which confirmed Reason was the owner. While one officer was still checking the passenger's identification, the other officer informed Reason he was free to go. The court concluded that at this point, the encounter again became consensual. 263 Kan. at 415. The officer asked Reason for permission to search the vehicle, Reason consented, and the officers found contraband. The court found the consent was voluntary, stating:

"There were no circumstances showing that Reason was coerced by police to consent to the search of his vehicle. Although two police officers were present, only Officer Johnson dealt with Reason. There was no showing that Officer Johnson used forceful language, brandished a weapon, or otherwise coerced Reason at the time of the consent. We conclude the consent to search was voluntary." 263 Kan. at 415-16.

Recently in *State v. Moore*, 283 Kan. 344, 351, 154 P.3d 1 (2007), this court cited to *DeMarco* and stated: "A driver may be detained after a routine traffic stop, however, if the encounter becomes consensual." After concluding the encounter did not become consensual, the court examined whether the stop could be legally extended based upon a reasonable suspicion of illegal conduct. See 283 Kan. at 354-59.

Thus, the framework of the analysis utilized in Kansas is different from that utilized by the *Robinette III* court. The *Robinette III* court allowed an extension of the detention beyond the traffic stop for an additional question but demanded the development of reasonable suspicion after the question was asked. 80 Ohio St. 3d at 241. The *Robinette III* court did not discuss the possibility of a

consensual encounter, perhaps because it was not until the decision in *United States v. Drayton,* 536 U.S. 194, 153 L. Ed. 2d 242, 122 S. Ct. 2105 (2002), that the United States Supreme Court clearly separated the analysis of the consensual encounter from the analysis of the consensual search. *Robinette III* skips the consensual encounter analysis and jumps to the consent to search. Consequently, when the *Robinette III* court discussed the blurring of the transition between the traffic stop and the request to search, it did so as part of its analysis of whether consent purged the taint of the illegal detention. Yet, the Court of Appeals panel in this case applied the analysis to the separate question of whether the encounter was voluntary. The distinction can be significant because, as in *Robinette III,* the illegal detention can taint the consent.

The State does not base its arguments on these analytical distinctions but, along with the *amicus curiae,* argues that by finding persuasive the reasoning of Ohio's *Robinette III* and requiring a physical disengagement, the Court of Appeals unreasonably rejected the holdings of the Tenth Circuit Court of Appeals.

### Tenth Circuit Cases

The Tenth Circuit Court of Appeals recognizes two analytically distinct encounters: the seizure and the consensual continuation of the encounter after the seizure has terminated. In fact, when the *DeMarco* court stated that the encounter could cease to be a detention if the driver voluntarily consented to additional questioning, it quoted *United States v. Mendez,* 118 F.3d 1426, 1429-30 (10th Cir. 1997), as authority. *DeMarco,* 263 Kan. at 734. Similarly, when discussing the analysis of two distinct encounters in *Reason,* the court quoted *United States v. Anderson,* 114 F.3d 1059, 1064 (10th Cir. 1997). *Reason,* 263 Kan. at 410.

The Tenth Circuit has explained that if the detention has ceased and a person voluntarily consents to a search, "there is no seizure, and hence the Fourth Amendment's strictures are not implicated." *United States v. Sandoval,* 29 F.3d 537, 540 (10th Cir. 1994). But if a detention continues without a reasonable and articulable suspicion of illegal activity or there is not a voluntary consent to additional questioning "evidence derived from further questioning

(or, a fortiori, from an ensuing search) is impermissibly tainted in Fourth Amendment terms." 29 F.3d at 540.

In applying the decisions of the United States Supreme Court, the Tenth Circuit Court of Appeals " 'follow[s] the bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned . . . .' [Citation omitted.]" *United States v. Bradford*, 423 F.3d 1149, 1158 (10th Cir. 2005). The court has explained that during a "routine traffic stop, an officer's retention of a defendant's documents is significant because it indicates that the defendant, as a general rule, did not reasonably feel free to terminate the encounter and, therefore, the government cannot rely on the defendant's consent to justify further detention, questioning, or a search. [Citations omitted.]" *United States v. Burch*, 153 F.3d 1140, 1143 (10th Cir. 1998).

The State at least implies that this bright-line rule should be applied in Kansas to mean that upon return of the driver's license the encounter has terminated. However, this suggestion stretches beyond the Tenth Circuit's holdings. Under those cases, even with the return of the driver's license, the encounter can remain a detention when law enforcement conduct as perceived by a reasonable person would communicate that the person was not free to decline law enforcement requests or end the encounter. See *Bradford*, 423 F.3d at 1158.

In citing factors that might communicate the continuation of a seizure, the Tenth Circuit Court of Appeals has frequently cited the *Mendenhall* factors, including " 'the threatening presence of several officers, the display of a weapon by an officer, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.' [Citations omitted.]" *United States v. Werking*, 915 F.2d 1404, 1408 (10th Cir. 1990); see also *United States v. Cardenas-Alatorre*, 485 F.3d 1111, 1118 (10th Cir. 2007) (" '[A] coercive show of authority, such as the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice' may provide an objectively reasonable basis for a driver to believe that he or she is not free to leave. [Citation omitted.]").

Often, however, the return of the documents signals the end of the detention, and the continued contact is found to be consensual. See, *e.g.*, *United States v. Wallace*, 429 F.3d 969, 974-75 (10th Cir. 2005) (addressing situation where, after traffic stop ended, driver consented to answering officer's questions and to search of vehicle); *United States v. Gregoire*, 425 F.3d 872, 874-75, 879 (10th Cir. 2005) (holding driver consented to additional questioning after officer issued warning); *Bradford*, 423 F.3d at 1158-59 (holding driver voluntarily consented to further questions after trooper returned driver's documentation); *United States v. Rosborough*, 366 F.3d 1145, 1148-49 (10th Cir. 2004) (holding driver voluntarily consented to search of his vehicle after officer returned driver's license and registration and issued a warning); *United States v. Cline*, 349 F.3d 1276, 1288 (10th Cir. 2003) (holding driver voluntarily consented to search after officer returned driver's license and told driver he was free to go); *United States v. Manjarrez*, 348 F.3d 881, 885-86 (10th Cir. 2003) (holding officer's encounter with driver became consensual after officer returned driver's license, issued warning, and told driver they were "through"); *United States v. Taverna*, 348 F.3d 873, 878-79 (10th Cir. 2003) (holding traffic stop became consensual encounter after officer returned driver's documentation, issued warning, and allowed driver to get out of patrol car; rejecting argument that when uniformed officer yelled at him to get his attention while returning to car, further questioning was coercive); *United States v. Bustillos-Munoz*, 235 F.3d 505, 514-15 (10th Cir. 2000) (holding traffic stop became consensual encounter after officer returned license and vehicle registration to driver and informed driver he was free to leave); *United States v. West*, 219 F.3d 1171, 1176-77 (10th Cir. 2000) (holding traffic stop between officer and driver became consensual encounter after officer returned driver's documentation and issued warning; rejecting claim that officer's posture was extremely aggressive as he leaned forward and stood close enough to car that the door could not be opened without hitting officer); *United States v. Ozbirn*, 189 F.3d 1194, 1200 (10th Cir. 1999) (holding driver consented to answer additional questions after officer completed traffic stop by issuing warning).

Kansas state courts are not bound to follow the precedent of the Tenth Circuit Court of Appeals; rather, the authority may be considered persuasive. *State v. Anderson*, 281 Kan. 896, 909, 136 P.3d 406 (2006); see *Moore*, 283 Kan. at 354 (consent search following vehicle stop, following the reasoning in *Mendez*, 118 F.3d at 1431).

Previously, this court has considered the Tenth Circuit's cases to be somewhat persuasive because, as previously noted, the Tenth Circuit's analytical division of the encounter has been followed. Additionally, as a practical matter, typically a driver would not feel free to leave if his or her driver's license has not been returned. Yet, the return of documentation does not automatically convert a detention into a consensual encounter. A reasonable person, even one possessing his or her license, may still not feel free to refuse the officer's requests or otherwise end the encounter because of other coercive circumstances. As Thompson suggests, the return of the driver's license cannot be considered a bright line; indeed, there can be no "infallible touchstone" in the totality of the circumstances analysis. *Schneckloth v. Bustamonte*, 412 U.S. 218, 229, 36 L. Ed. 2d 854, 93 S. Ct. 2041 (1973).

The Court of Appeals panel reached the same conclusion, expressing concern that "there may be a perception in the field that a 'bright line rule' merely requires the return of documentation to cleanse additional questioning." *Thompson*, 36 Kan. App. 2d at 261.

### Disengagement

Finding that the return of the license was not sufficient to cleanse the questioning, the Court of Appeals panel looked for a physical disengagement between the officer and Thompson and found that the lack thereof was "paramount" to its determination that the encounter was not consensual. 36 Kan. App. 2d at 259-61.

This court has never required a physical disengagement such as where the officer has walked away from the vehicle or left the driver's presence. Nor has the Tenth Circuit Court of Appeals. In fact, the Tenth Circuit has found encounters to be consensual under the totality of the circumstances even where the driver is sitting in the patrol car. See, *e.g.*, *Bradford*, 423 F.3d at 1158-59 (en-

counter was consensual after officer returned documentation, despite defendant's sitting in patrol car because officer did not use commanding tone, show of authority, or display weapon); *Anderson*, 114 F.3d at 1064-65 (encounter was consensual; trooper handed motorist warning citation, said he could go back to his vehicle, and returned documentation; motorist chose to stay in patrol car and answer questions). But see *Sandoval*, 29 F.3d at 542 ("No one who is seated in a law enforcement officer's vehicle after having been stopped by the officer for a perfectly legitimate reason, and who then asks whether the stop is at an end . . . and is immediately told 'No' and to 'wait a minute,' can reasonably view himself or herself as free to leave the patrol car.").

Moreover, imposing a requirement that an officer walk away or otherwise physically "disengage" would be inappropriate. Such a requirement would establish a bright-line rule—like requiring an officer to say "you are free to go"—which has been rejected by the United States Supreme Court. *Robinette II*, 519 U.S. at 39-40.

On the other hand, there are indications that this court and the Tenth Circuit would consider the physical movement or location of the officer as a factor in the totality of the circumstances relevant to the determination of whether the continuation of an encounter is consensual. Recently, the Tenth Circuit observed that an officer "handed back defendants' papers, thanked them for their time, and began walking away. Although such a determination is context-specific, in general those actions are sufficient to indicate that an individual is free to leave." *E.g., United States v. Guerrero*, 472 F.3d 784, 789 (10th Cir. 2007). Similarly, in this court's recent decision in *Moore*, the lack of movement away from the vehicle was a factor. The court noted that the large, physically imposing officer "remained with his face" at the window, "apparently alternating between leaning on and nearly touching the frame." *Moore*, 283 Kan. at 353-54.

Thus, paraphrasing the United States Supreme Court's conclusion in *Bustamonte*, 412 U.S. at 249, that "while the subject's knowledge of a right to refuse is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent," we conclude

the physical movement of a law enforcement officer is a factor that can be taken into account when considering whether a reasonable person would feel free to refuse an officer's request or otherwise terminate his or her encounter with a law enforcement officer, but the State is not required to prove a physical disengagement between the end of a detention and the beginning of a consensual encounter.

Additionally, when considering whether a consent to search is voluntary (the context in which the issue was applied in *Robinette III*), disengagement has not been utilized by the Tenth Circuit Court of Appeals or this court when analyzing the question. The factor is not, however, inconsistent with the factors that have been applied. See *Guerrero*, 472 F.3d at 789-90. The reasoning in *Robinette III*, therefore, is not at complete odds with either the Tenth Circuit or Kansas appellate cases. To the extent *Robinette III* establishes that disengagement can be a factor considered in the totality of the circumstances relevant to a determination of whether a consent to search is voluntary, we do not disagree.

### Paramount Consideration v. Totality of the Circumstances

That being said, however, the State further argues that even if disengagement is a factor, the Court of Appeals panel erred in considering the lack of disengagement as being "paramount" to its conclusion. *Thompson*, 36 Kan. App. 2d at 260. The State argues that the panel's declaration suggests the panel gave the "disengagement" factor more weight than the other factors and this tip of the balance contradicts the notion of examining all relevant factors under the totality of the circumstances.

Consistent with a consideration of the totality of the circumstances, no one factor can be legally dispositive. See *Vieth v. Jubelirer*, 541 U.S. 267, 291, 158 L. Ed. 2d 546, 124 S. Ct. 1769 (2004) (the "totality of the circumstances" means that "all conceivable factors, none of which is dispositive, are weighed with an eye to ascertaining [the issue in question]"); *United States v. Drayton*, 536 U.S. 194, 207, 153 L. Ed. 2d 242, 122 S. Ct. 2105 (2002) ("totality of the circumstances" means not giving "extra weight" to any specific factor); *United States v. Arvizu*, 534 U.S. 266, 274, 151

L. Ed. 2d 740, 122 S. Ct. 744 (2002) (considering some factors in isolation from others fails to comport with totality of the circumstances test).

Yet, we do not expect courts to merely count the number of factors weighing on one side of the determination or the other. In the totality of the circumstances, a factor may be more indicative of a coercive atmosphere in one case than in another. Compare *Guerrero*, 472 F.3d at 789 (presence of second officer a factor "only in the mildest of forms" where second officer sat a distance away and had no interaction with defendant), with *Moore*, 283 Kan. at 354 (reasonable person would not feel free to leave where physically imposing officer alternated between leaning on or near car and second officer, "also armed, was close behind him").

Here, the Court of Appeals panel made the lack of disengagement legally paramount, elevating it to the same determinative role as the "you're free to go" statement required by the *Robinette I* court. This application is contrary to the holdings of the United States Supreme Court.

### *Officer's Prestop Intent*

The State also challenges the Court of Appeals' consideration of Officer Weinbrenner's prestop intent to seek Thompson's consent to search his vehicle in determining whether the extended detention became consensual. Specifically, the State argues that the panel erred in considering the officer's subjective intent.

At the hearing on Thompson's motion to suppress evidence, Officer Weinbrenner admitted that he had previously gained information regarding Thompson's involvement with illegal drugs from a confidential informant and from a police detective. Weinbrenner told his back-up officer, who was called to the scene as a part of the routine of nighttime stops, that he was going to ask for consent to search.

The Court of Appeals found the officer's subjective intent was an important factor in deciding that the extended encounter was nonconsensual:

"The officer expressed a prestop desire to seek consent to search the Thompson vehicle; although this may have little to do with the objective belief of Thompson,

the officer's intent to effect a search undoubtedly influenced his actions in the encounter." *Thompson*, 36 Kan. App. 2d at 260.

The State argues that the Court of Appeals erred in referring to the officer's prestop intention to seek consent to search because this intention was never communicated to Thompson and Thompson was unaware of the second officer's presence at the scene when he agreed to answer further questions. The State relies on *Whren v. United States*, 517 U.S. 806, 135 L. Ed. 2d 89, 116 S. Ct. 1769 (1996), and *Anderson*, 114 F.3d 1059, to support its contention that the officer's subjective motivations were irrelevant under the circumstances.

In *Whren*, the United States Supreme Court held that a traffic stop is justified at its inception if the officer has probable cause to believe that a traffic infraction has occurred, without regard to other motivations for the stop or the standard practice of the police. The Court stated: "Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." 517 U.S. at 813; see also *Brendlin v. California* 551 U.S. 249, 260-63, 168 L. Ed. 2d 132, 127 S. Ct. 2400 (2007) (rejecting analysis that passenger was not seized because officer's subjective intent in stopping car did not focus on passenger).

The Tenth Circuit Court of Appeals followed this reasoning in *Anderson*, where a Kansas highway patrol trooper pulled over a motorist because his Suburban was following too closely to the car in front of it. After running a computer check on the motorist's driver's license and vehicle registration, the trooper began writing a warning citation and asked for a back-up officer. The trooper then issued the warning and returned the driver's license and registration papers. At this point, the trooper asked the motorist if he was carrying any narcotics; the motorist answered in the negative. Then, the trooper asked if he could search the Suburban. The motorist gave consent to the search. Officers found 6 kilograms of cocaine in a hidden compartment in the gas tank. The motorist eventually pled guilty to possession with intent to distribute cocaine.

On appeal, the motorist argued that his consent to search the vehicle was involuntary because the consent was obtained while he

was not free to leave. He based this argument on the fact that, at the time he gave consent, the trooper conducting the stop had already called for back-up because he intended to search the vehicle. The *Anderson* court ruled that (1) this fact was irrelevant unless the trooper communicated that intent to the motorist in some way that made him feel compelled to consent and (2) the trooper's subjective motivations were immaterial. *Anderson*, 114 F.3d at 1065; see also *Michigan v. Chesternut*, 486 U.S. 567, 575 n.7, 100 L. Ed. 2d 565, 108 S. Ct. 1975 (1988) ("[T]he subjective intent of the officers is relevant to an assessment of the Fourth Amendment implications of police conduct only to the extent that that intent has been conveyed to the person confronted."); *United States v. Mendenhall*, 446 U.S. 544, 554, n.6, 64 L. Ed. 2d 497, 100 S. Ct. 1870, *reh. denied* 448 U.S. 908 (1980) (subjective intent of police is irrelevant to question whether seizure occurred unless it is conveyed to defendant); *United States v. Botero-Ostina*, 71 F.3d 783, 787 (10th Cir. 1995), *cert. denied* 518 U.S. 1007 (1996) (in determining constitutionality of traffic stop, sole inquiry is whether officer had reasonable suspicion that motorist violated traffic and equipment regulations; it is irrelevant whether stop was sufficiently ordinary or routine according to general practice of police department or particular officer making the stop or whether officer may have had other subjective motives for stopping the vehicle).

This objective, rather than subjective, approach has been recognized by our Kansas appellate courts as well:

"An officer can make an investigative stop if he has a reasonable and articulable suspicion, based upon facts known prior to the stop, that the defendant has committed, is committing, or is about to commit a crime. The test is an objective one." *State v. Bailey*, 247 Kan. 330, 342, 799 P.2d 977 (1990), *cert. denied* 500 U.S. 920 (1991) (Allegrucci, J., dissenting).

See also, *e.g.*, *Moore*, 283 Kan. at 350 (citing *Anderson*, 281 Kan. at 901); *City of Norton v. Stewart*, 31 Kan. App. 2d 645, Syl. ¶ 1, 70 P.3d 707 (2003) (officer's subjective motive or deviation from normal procedure in investigating traffic violation is not determinative of motorist's claim of unlawful detention so long as officer was justified because of the traffic violation; must objectively ex-

amine whether detention exceeded scope and duration of traffic stop).

Given the fact that the law renders the officer's subjective intent irrelevant unless the driver is somehow made aware of the intent, and there was no evidence that Thompson was made aware of Officer Weinbrenner's intent to seek his consent to search the vehicle, the Court of Appeals erred in finding such intent to be an important factor in considering whether the encounter was consensual. Only objective factors should have been considered.

### Emergency Lights

Next, the State takes issue with the Court of Appeals' consideration of the continued display of emergency lights at the time Officer Weinbrenner asked for consent to search Thompson's vehicle. The Court of Appeals found the lights to be a show of authority. 36 Kan. App. 2d at 260.

The State argues that the use of emergency lights conveys different messages, depending on the information conveyed to the motorist. Because the emergency lights remained activated after the traffic stop had terminated, the State urges this court to adopt the reasoning of the Idaho Supreme Court in *State v. Roark*, 140 Idaho 868, 871, 103 P.3d 481 (2004), where it was held that reasonable persons would understand that, when the traffic stop is concluded and they are so advised, they are free to leave. The *Roark* court explained:

"It is not practical nor necessary that an officer turn off his emergency lights before he may effectively instruct an individual who has been stopped that he may leave. No reasonable person who has been unequivocally told that he may go, as Roark was, would believe that he should disregard the statement merely because the patrol car's overhead lights are still flashing." 140 Idaho at 871.

When Roark's driver's license and other documents were returned to him, the officer told him at least twice that he was free to leave. After Roark had returned to his car to go, the officer asked politely for permission to ask Roark a question. The officer neither commanded Roark to stay, nor prefaced his request with any other comments that suggested a continuing exercise of authority. While the Idaho Supreme Court recognized that the activation of the

emergency lights is a command for motorists to stop, it determined that "the fact that the emergency lights had not yet been turned off did not constitute a continued show of authority detaining Roark in the face of at least two notifications from the officer that he was free to go." 140 Idaho at 871.

Here, the State gives us no compelling reason to adopt the fact-specific holding from Idaho. Roark was told unequivocally that he could go. In contrast, Thompson was not.

Despite the factual distinction, the premise of the State's argument has merit. Considered as part of the totality of the circumstances, the presence or absence of emergency lights may or may not be significant; emergency lights may signify different meanings under different circumstances. For example, when emergency lights are activated to initiate a traffic stop, there is a clear signal of a seizure. In fact, it is unlawful for a driver to fail to stop when a police officer signals the driver by using emergency lights. K.S.A. 8-1568 (fleeing and eluding). Similarly, in *State v. Morris*, 276 Kan. 11, 72 P.3d 570 (2003), this court concluded that the encounter was not consensual when officers parked behind the motorist's truck that was stopped in a secluded location off a roadway, activated the emergency lights, and illuminated the back of the truck with spotlights. The court held that activating the lights under those circumstances was a show of authority, communicating an intent to restrict the motorist's freedom of movement. 276 Kan. at 20; see also *State v. Greever*, 286 Kan. 124, 136, 183 P.3d 788 (2008) (officer's seizure of motorist occurred when motorist saw the emergency lights and submitted to officer's show of authority by not fleeing); *State v. Hayes*, 35 Kan. App. 2d 616, 624-26, 133 P.3d 146 (2006) (considered several factors in holding that encounter was not voluntary, including whether other officers were present, whether officer displayed a weapon, whether officer touched driver, whether officer used commanding tone, whether driver's license was returned to driver, whether officer left emergency lights flashing, and whether officer and driver were talking).

In contrast, the use of the lights may not convey a seizure or show of authority. For example, in *Morris* we recognized there

could be situations where a reasonable person would understand the emergency lights had been activated for safety reasons, such as where an officer stops to assist a stranded motorist. 276 Kan. at 23-24. Or, in a situation more similar to that in *Roark*, after a traffic stop concludes and the officer returns to the patrol car but keeps the lights activated for safety reasons while stopped on the side of the roadway, a reasonable person would understand he or she was free to proceed and need not remain stopped while the officer completes reports or performs other activities after clearly ending the encounter.

Furthermore, as discussed in *Moore*, an officer can turn off emergency lights after a driver pulls over and yet, in the totality of the circumstances, a reasonable person may still not feel free to terminate the encounter. *State v. Moore*, 283 Kan. 344, 353-54, 154 P.3d 1 (2007).

The facts of this case present circumstances somewhere in between these cited cases. The lights remained activated, a traffic warning was given, and Thompson was told to have a nice day, but there was no unequivocal signal that he was free to go. Also, the nighttime stop means the lights could have been left on for safety purposes. Given the ambiguity of the situation, the flashing emergency lights could be a factor in the totality of the circumstances relevant to a determination of whether an encounter with a law enforcement officer is consensual.

### Motorist's Subjective State of Mind

Finally, the State contends that the Court of Appeals erred in considering Thompson's subjective state of mind in determining the consensual nature of the police encounter. The State's contention has merit.

As previously pointed out, although the initial statements by the United States Supreme Court used both objective and subjective factors, the subjective component was abandoned. Courts use an objective approach to determine whether a police encounter is consensual: the voluntariness depends on whether the police conduct would have conveyed to a *reasonable* person that he or she was not free to refuse the officer's requests or otherwise end the

encounter. See *Mendenhall*, 446 U.S. 554 (principal opinion); *United States v. Hernandez*, 93 F.3d 1493, 1498 (10th Cir. 1996); *Moore*, 283 Kan. at 351-52; *State v. Reason*, 263 Kan. 405, 410, 951 P.2d 538 (1997). Consequently, Thompson's state of mind is not a relevant circumstance.

The Court of Appeals correctly recognized this objective approach but appears to have veered off the well-beaten path: "[T]he defendant testified that he did not feel free to go when the officer asked about further questioning; although the applicable standard is 'a reasonable person,' the defendant's actual state of mind is not irrelevant in considering the totality of circumstances." *Thompson*, 36 Kan. App. 2d at 260.

The State correctly asserts that the Court of Appeals erred in considering Thompson's state of mind in examining the totality of the circumstances.

### EXTENDED TRAFFIC STOP—WAS IT CONSENSUAL?

The question remains: In light of the conclusions drawn above and the facts of this case, can we independently conclude that a reasonable person would have felt free to refuse the officer's request or otherwise end the encounter? See *Moore*, 283 Kan. at 352 (de novo standard applies to appellate review of the trial court's ultimate legal conclusion regarding whether reasonable person would feel free to refuse law enforcement requests or to terminate an encounter). The answer is "yes."

First, substantial competent evidence supports the trial court's factual findings. A review of the videotape and testimony discloses that Officer Weinbrenner's emergency lights were activated throughout the stop. When Officer Michaels arrived as back-up, he stayed to the rear of Thompson's vehicle and merely observed, never drawing his weapon. After running a check on Thompson's driver's license, Weinbrenner returned the license to Thompson and told him to have a nice day. Thompson thanked the officer, and Weinbrenner turned and took one step away from the vehicle. Weinbrenner then turned back around to the window and asked casually and in a cordial tone if he could ask Thompson a few more questions. This resulted in Thompson's consent to a search of the

vehicle. Weinbrenner did not draw his weapon, nor did he touch Thompson or the vehicle before receiving consent to search.

As we consider the totality of these circumstances, we must first determine the coercive effect of the encounter by whether a reasonable person would have felt free to terminate the encounter or to refuse to answer questions. Because this determination is fact-driven, no list of factors can be exhaustive or exclusive. Some factors occur frequently, including the following ones that tend to establish that an encounter was consensual: knowledge of the right to refuse, a clear communication that the driver is free to terminate the encounter or refuse to answer questions, return of the driver's license and other documents, and a physical disengagement before further questioning. In this case, Officer Weinbrenner returned Thompson's license and said, "Have a nice day." Thompson said, "Thank you." There was not a clear statement that the traffic stop had ended, that Thompson had the right to say "no," and not a clear physical disengagement.

Other factors that frequently occur tend to indicate a coercive environment, including the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person, the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, the prolonged retention of a person's personal effects such as identification, a request to accompany the officer somewhere, interaction in a nonpublic place, absence of other members of the public, or the display of emergency lights. See *State v. Lee*, 283 Kan. 771, 777-78, 156 P.3d 1284 (2007) (encounter in public park, even though included commands designed to ensure officer safety, deemed a consensual encounter because no coercive circumstances were present); *State v. Parker*, 282 Kan. 584, 592-93, 147 P.3d 115 (2006) (even though officer pulled in behind defendant's car there was no other show of authority and reasonable person would feel free to terminate encounter); *United States v. Guerrero*, 472 F.3d 784, 790 (10th Cir. 2007).

Here, some of these circumstances existed. The lights remained activated. We note, however, as previously discussed, the dark of night and the end of the traffic stop make the display of lights

ambiguous and not a clear show of authority. In addition, Thompson pulled over in an alley, and two officers were present. Like *Guerrero*, 472 F.3d at 789, where the Tenth Circuit Court of Appeals found the presence of an additional officer a factor "only in the mildest of forms" because the officer was a distance away and had no contact with the defendant, in this case the trial court made the factual finding that Thompson was unaware of the back-up officer's presence. The back-up officer did not approach Thompson or Thompson's vehicle and had no contact with Thompson.

On the other hand, there was no application of force, no intimidating movement, no overwhelming show of force, no brandishing of weapons, no threat, no command, not even an authoritative tone of voice. Officer Weinbrenner did nothing to "convey a message that compliance with [his] requests [was] required." *Florida v. Bostick*, 501 U.S. 429, 435, 115 L. Ed. 2d 389, 111 S. Ct. 2382 (1991). No factor would indicate that Thompson's will was "overborne and his capacity for self-determination critically impaired." See *Bustamonte*, 412 U.S. at 225. Nothing about the encounter indicated duress or coercion. We conclude that under the totality of the circumstances a reasonable person would feel free to decline the officer's requests or otherwise terminate the encounter.

The trial court correctly determined the detention was consensual.

### Searches—Were They Consensual?

Finally, we must determine whether the two consents to search were valid. This requires consideration of whether there is substantial competent evidence that the consents were unequivocal and specific and given without duress or coercion, express or implied. *Moore*, 283 Kan. at 360.

Officer Weinbrenner offered clear and positive testimony that the consents to search were unequivocal and specific. Additionally, there was substantial competent evidence that the consents to search were given without duress or coercion. In making this determination, no one factor is dispositive and relevant factors indicating coercion are much the same as those applied to determine if an encounter is consensual. See, *e.g.*, *United States v. Hill*, 199

F.3d 1143, 1148-50 (10th Cir. 1999); *Anderson*, 114 F.3d at 1064. Again, none of those factors suggest that the consent was involuntary in this case.

The judgment of the Court of Appeals reversing and remanding is reversed on the single issue before us. The case is remanded to the Court of Appeals to consider the issues not addressed in its opinion. The judgment of the trial court on the single issue before us is affirmed.

JOHNSON, J., not participating.
LARSON, S.J., assigned.

BEIER, J., dissenting: I respectfully dissent and would reverse and remand.

I do not share the majority's confidence that the phoenix of a voluntary police-citizen encounter arose out of the ashes of the traffic stop of defendant Thompson.

As the majority notes, an appellate court gives deference to the factual findings of a district judge ruling on a motion to suppress; however, appellate judges draw an independent conclusion on the ultimate legal issue of whether suppression was appropriate. See *State v. Fisher*, 283 Kan. 272, 280, 154 P.3d 455 (2007).

The majority also notes correctly that the State bears the burden of demonstrating that a warrantless search was constitutional. See *State v. Anderson*, 281 Kan. 896, 901, 136 P.3d 406 (2006). Here, the only potentially applicable exception to the warrant requirement is consent. See *State v. Rupnick*, 280 Kan. 720, 727, 125 P.3d 541 (2005) (listing exceptions to warrant requirement). The State had to present sufficient evidence for us to arrive at the conclusion that defendant gave a valid consent before the officer searched defendant's vehicle.

Before reaching the issue of the consent to search, the majority holds that the nighttime traffic stop at issue here had become a

voluntary police-citizen encounter. The record on appeal demonstrates that the officer returned defendant's driver's license and told him to have a nice day; the officer then turned, took one step toward the rear of the vehicle, and immediately turned back around to return to the driver's side window and inquire of defendant, "Mind if I ask you a couple of questions?" This series of actions by the police officer, at night, with the emergency lights of the police car still activated, in the majority's view, would have led a reasonable person in defendant's position to understand he was free to say no to additional questioning and no to the officer's subsequent request to search and then be on his merry motorist way. The majority thus concludes that the totality of the circumstances supports its conclusion of a voluntary police-citizen encounter following on the heels of a traffic stop, despite its repeated recognition that there was no "clear" signal or communication that the character of the interaction had changed.

Especially given the burden of proof placed on the State, I think the majority expects far too much chutzpah from a person in defendant's position. I certainly would not rule that a traffic stop can never be converted into a voluntary encounter, but I would require more than the totality of the circumstances demonstrates here.

Because I would hold that the nature of the encounter did not change, the detention of defendant beyond the time necessary to effectuate the purpose of the traffic stop violated his rights under the Fourth Amendment to the United States Constitution. See *State v. DeMarco*, 263 Kan. 727, 733-34, 952 P.2d 1276 (1998). In order for us to determine whether defendant's consent to the vehicle search was nevertheless valid, the State would have to show that the passage of time or some other event or circumstance purged the taint of the unconstitutional detention. See *State v. Grace*, 28 Kan. App. 2d 452, 460, 17 P.3d 951, *rev. denied* 271 Kan. 1039 (2001) (citing *United States v. Mendoza-Salgado*, 964 F.2d 993, 1011 [10th Cir. 1992]). Because it has not done so on the record before us, I, like the Court of Appeals panel, would reverse and remand for further proceedings in the district court.

ROSEN, J., joins the foregoing dissenting opinion.