(196 P.3d 441)
No. 98,880

State of Kansas, *Appellee,* v. Shannon D. Tatum, *Appellant.*

—

Opinion filed November 26, 2008.

*John Ivan, Jennifer L. Lewis,* and *Colby Rieke,* of Shawnee Mission, for appellant.

*Steven J. Obermeier,* assistant district attorney, *Elizabeth J. Dorsey,* legal intern, *Phill Kline,* district attorney, and *Stephen N. Six,* attorney general, for appellee.

Before MALONE, P.J., MARQUARDT and STANDRIDGE, JJ.

MALONE, J.: Shannon D. Tatum appeals his convictions of one count each of cultivation of marijuana and possession of drug paraphernalia. The single issue is whether the district court erred in denying Tatum's motion to suppress the evidence. Specifically, Tatum claims the district court erred in ruling that his consent to search his residence was voluntary. Although we disagree in part with the district court's legal analysis, we uphold the district court's ultimate conclusion that Tatum's consent was voluntary.

On June 10, 2004, Kansas Bureau of Investigation (KBI) Agent Greg Skelton was conducting surveillance at the Green Circle Hydroponics Store in Overland Park, Kansas. The store sells items used for cultivating plant life indoors with or without soil, which can also be used to grow marijuana indoors. The investigation involved agents documenting the store's customers and their purchases both photographically and with their vehicle tags and descriptions. Skelton observed Tatum leaving the store with a bag that Skelton believed contained a jug of liquid fertilizer, which is commonly used in the cultivation of marijuana. Later, the KBI learned Tatum's name and residence through his vehicle tag.

Over the next year, KBI agents unsuccessfully attempted to contact Tatum at his residence, sifted through his trash for marijuana residue or paraphernalia, and examined his utility records. When Skelton went to Tatum's residence, he observed it had a second air conditioning unit for the basement. This was significant to Skel-

ton because the use of high intensity lights to artificially create sunshine for marijuana grown indoors creates tremendous heat which needs to be cooled down in the area where the plants are grown. Skelton also observed clay balls in the landscaping near Tatum's front door, which are typically used as a substitute for soil to grow plants indoors.

On June 23, 2005, at approximately 11:15 a.m., Skelton and KBI Senior Special Agent Gary Smith arrived at Tatum's residence in an unmarked car and were wearing street clothes which covered their weapons. They knocked on the front door or rang the doorbell and Tatum answered. Skelton and Smith identified themselves as KBI agents and showed Tatum their badges. Tatum stepped out on his front porch and closed the door behind him. Skelton told Tatum they were following up on information that he was growing marijuana inside the residence. Skelton wanted to give Tatum the impression that they knew he was growing marijuana and had evidence against him. Skelton pointed out the clay balls in the front planter by the porch and told Tatum that he knew they were used for growing marijuana.

Tatum initially denied any knowledge of illegal drug activity. The agents informed Tatum that he would not be arrested but that they would like to come into the residence with his permission to collect the marijuana and cultivation equipment which would be presented to the district attorney. Both agents testified that they informed Tatum that they did not have a search warrant and that Tatum did not have to consent to the search.

Tatum was in his early 40's with a college education, he had a job in the medical field, he could read and write, and he appeared to understand the agents' questions. He was primarily concerned about his neighbors' perceptions if his house was searched by the police and he was arrested in front of his neighbors. The agents assured Tatum that they would not use marked units or officers in uniform to assist in the search and the collection of evidence and he would not be arrested that day. During this conversation, Tatum was never physically detained or handcuffed, none of his physical property was taken, the agents never yelled or raised their voices,

no threats were made, no weapons were drawn, and the tone was pleasant and conversational.

After 5 to 10 minutes, Tatum consented to the search and invited the agents inside the residence. At Skelton's request, Tatum walked the agents through the house and pointed out the items associated with growing marijuana indoors. At that point, Smith enlisted the help of some other agents, while Skelton sat down in the living room with Tatum and went over a written consent to search form. Tatum signed the consent. Tatum never changed his mind or attempted to revoke his verbal or written consent.

While the other agents collected the evidence, Skelton informed Tatum that he would like to interview him but that it was completely voluntary. Tatum agreed to talk and gave Skelton a full statement regarding his growing marijuana. When the interview was over, Skelton thanked Tatum for his cooperation, gave him a business card, and asked if he felt threatened or coerced while the agents were there. Tatum replied in the negative and thanked the agents for their professionalism at his residence.

Tatum's testimony was consistent with the agents' testimony for the most part, except Tatum denied that the agents informed him that he did not have to consent to the search. According to Tatum, the agents told him that he could either do it the easy way or the hard way, but one way or another the agents would ultimately search his residence. Tatum testified he felt intimidated because the agents gave him the impression that they already had evidence against him.

Tatum was charged with cultivating marijuana and possession of drug paraphernalia. Tatum filed a motion to suppress the evidence, arguing he was subjected to an illegal seizure and his consent to search was involuntary. Following a hearing, the district court issued a memorandum decision. The district court found the facts consistent with the agents' testimony. The district court noted that the testimony was conflicting on whether the agents informed Tatum that he did not have to consent to the search, but the district court concluded the "discrepancy is not dispositive." The district court denied the motion to suppress, reasoning that although the initial voluntary encounter turned into an illegal seizure, Tatum's

subsequent consent was the product of his own free will and was sufficient to purge the illegal detention. Tatum was found guilty as charged following a bench trial on stipulated facts. He timely appeals.

Tatum claims the district court erred in denying his motion to suppress the evidence. Tatum argues that the district court should have suppressed the evidence seized from his residence and his statements to the agents because they were the result of an illegal detention and an involuntary consent to search. Tatum also argues there was no intervening event to purge the taint of the illegal detention.

The State claims the district court was right for the wrong reason. The State argues that the district court's legal determination that the voluntary encounter turned into an illegal seizure was erroneous. However, in the event there was an illegal seizure, the State agrees with the district court that Tatum's subsequent voluntary consent to search purged the taint of the illegal detention.

An appellate court reviews the district court's decision on a motion to suppress evidence using a bifurcated standard. Without reweighing the evidence, the appellate court reviews the district court's factual findings to determine whether they are supported by substantial competent evidence. The appellate court then reviews the ultimate legal conclusion regarding the suppression of evidence using a de novo standard. *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 (2007).

In keeping with the district court's analysis, we will first determine whether the district court was correct in deciding that the voluntary encounter between Tatum and the agents escalated to an illegal seizure. We will then review the district court's decision that Tatum's consent to search was voluntary and purged the taint of the illegal detention.

The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." Section 15 of Kansas Constitution Bill of Rights contains similar language and "provides protection identical to that provided under the Fourth Amendment to the United

States Constitution." *State v. Morris*, 276 Kan. 11, 17, 72 P.3d 570 (2003). The Fourth Amendment and § 15 of the Kansas Constitution Bill of Rights have been found to give special deference to the sanctity of privacy in an individual's home. See *State v. Platten*, 225 Kan. 765, 768-69, 594 P.2d 201 (1979).

The four types of police-citizen encounters are voluntary or consensual encounters, investigatory detentions, public safety stops, and arrests. *State v. Thompson*, 284 Kan. 763, 772, 166 P.3d 1015 (2007). A voluntary encounter does not implicate the Fourth Amendment because a person voluntarily interacting with law enforcement is not considered to be seized. *State v. Young*, 37 Kan. App. 2d 700, 703-04, 157 P.3d 644 (2007).

The law is well settled that a law enforcement officer, without any reasonable suspicion of criminal activity, may approach a residence by a route available to the general public, knock on the door of the residence, and speak with an occupant of the residence who responds to the knocking. See, *e.g.*, *State v. Fisher*, 283 Kan. 272, 296, 154 P.3d 455 (2007). Such an encounter, known as a knock-and-talk, is consensual and does not implicate a citizen's Fourth Amendment rights. See *State v. Dwyer*, 28 Kan. App. 2d 238, 240, 14 P.3d 1186 (2000), *rev. denied* 270 Kan. 900 (2001).

However, such a voluntary encounter may become a seizure if an officer by word or deed demonstrates a show of authority which would communicate to a reasonable person that he or she is not free to leave and the person submits to the show of authority. *Morris*, 276 Kan. at 18-19. A court looks to the totality of the circumstances to determine whether a particular encounter constitutes a seizure implicating Fourth Amendment rights. The test of whether a seizure has occurred is based on whether a reasonable person would have felt free to decline an officer's requests or otherwise terminate the encounter. *Thompson*, 284 Kan. at 775. In order for a seizure to be legal, a law enforcement officer must reasonably suspect a person is involved in criminal activity. *Young*, 37 Kan. App. 2d at 704.

Appellate review of the district court's determination of whether a reasonable person would feel free to refuse the officer's requests or otherwise terminate the encounter consists of two parts: (1) the

factual underpinnings are reviewed under a substantial competent evidence standard and (2) the ultimate legal conclusion drawn from those facts, *i.e.*, whether a reasonable person would feel free to refuse the requests or to terminate the encounter, is reviewed under a de novo standard. *Thompson*, 284 Kan. at 776.

The Kansas Supreme Court has identified several objective factors to be used to consider whether there was a coercive show of authority such that a reasonable person would not feel free to disregard the officer: presence of more than one officer, the display of a weapon, physical contact, or the use of a commanding tone of voice. *State v. Lee*, 283 Kan. 771, 775, 156 P.3d 1284 (2007). Additionally, the Tenth Circuit Court of Appeals has discussed several factors to be used in determining when a voluntary encounter becomes a seizure: the location of the encounter, particularly whether it is an open place in view of other people; whether the officers touch or physically restrain the defendant; whether the officers are in uniform or plain clothes; whether a weapon is displayed; the demeanor, number, and tone of voice of the officers; whether the officers retain any personal items of the defendant, such as tickets or identification, and for how long; and whether the defendant was specifically advised of his right to terminate the encounter or refuse consent. *United States v. Zapata*, 997 F.2d 751, 756-57 (10th Cir. 1993).

We will discuss two Kansas cases helpful in analyzing when a consensual encounter becomes a seizure. In *Dwyer*, law enforcement officers contacted the defendant at his residence and talked to him outside his apartment door which he was holding shut behind him. The officers testified they smelled burning marijuana and asked the defendant if he would show them where the marijuana was located. According to the officers, the defendant responded, " 'Yeah, okay,' and went into his apartment, leaving the door open behind him." 28 Kan. App. 2d at 239. The officers interpreted this to mean they had permission to enter, did so, and then obtained the defendant's permission to further search the apartment. The defendant testified that the officers asked him to get the marijuana, that he did not expect them to enter his apartment, and that he did not consent to a later search. The defendant

agreed the officers did not yell or use a loud tone of voice, did not touch or physically intimidate him, and did not prevent him from leaving the area outside the front door.

On appeal, the defendant argued that the conversation outside the door amounted to an unlawful seizure. The court rejected this argument reasoning that the defendant's own testimony belied the conclusion that his freedom was restricted in any meaningful way. The court concluded that "the politely and calmly executed 'knock and talk' conversation outside the apartment did not constitute an investigatory detention." 28 Kan. App. 2d at 240. Relying on the district court's assessment of the credibility of the witnesses, the court found that the defendant voluntarily, unequivocally, and specifically consented to the officers' entry into the apartment and to its subsequent search. 28 Kan. App. 2d at 240-41.

In *State v. Kermoade*, 33 Kan. App. 2d 573, 105 P.3d 730, *rev. denied* 279 Kan. 1009 (2005), law enforcement officers received a tip from an unreliable source that the defendants were growing marijuana in their home. Dressed in plain clothes, two officers knocked on the door, and a woman answered by opening the door only slightly. The woman refused the officers' request to come inside. The officers then asked the woman to step outside, which she did, shutting the door behind her. The officers explained they were investigating her neighbor and believed the neighbor was growing marijuana in the woman's home, and the officers asked for consent to search the residence. The woman made it clear that she did not want the officers entering her home. The officers explained that if she did not consent they would apply for a search warrant, which the judge may or may not grant. The officers explained they would secure the residence and although people would be free to leave, anyone who stayed would have to be in the presence of an officer.

At that point, the woman said she wanted to speak with her husband. She went into the basement of the house outside the officers' view, leaving the door cracked open. After the woman was inside the house for several minutes, the officers became concerned that evidence was being destroyed. The officers testified they smelled fresh marijuana, and they called for the woman to

come upstairs. The officers then entered the residence, and the testimony differed whether the officers were let in or came in on their own. The officers sat down in the living room with the husband and wife and had a 30-minute conversation where the possibility of a search warrant was discussed again and the officers sought consent to search the home. Ultimately, the husband and wife both consented to the search of the home where marijuana and equipment was discovered. After being charged, the defendants filed a motion to suppress the evidence which the district court granted. The district court concluded from the evidence that "the 'knock and talk' turned" into a " 'knock and twist the arm out of the socket' because [the officers] would not take 'no' for an answer." 33 Kan. App. 2d at 577.

On appeal, the court reasoned that although the initial encounter was a lawful "knock and talk," it transformed from a consensual encounter into a seizure when the officers asked the woman to step outside her home, when the officers would not take "no" for an answer, when they yelled for the woman to come back to the door after she was inside for several minutes, and when the officers said they would remain with each occupant of the home while a search warrant was sought. The court further noted that the defendants' movements were restricted and controlled, that the encounter lasted over 30 minutes, and that the officers' actions were coercive such that a reasonable person in the defendants' situation would not have felt free to disregard the officers' demands. The court then found that the seizure was unlawful because the officers had only an unreliable tip without corroborating evidence that the defendants were engaged in illegal activity. The court determined that the defendants' subsequent consent was not voluntary so as to purge the taint of the illegal seizure. The court reasoned that the officers' persistence overcame the defendants' will and there was no sufficient intervening time or event between the illegality and the evidence obtained. 33 Kan. App. 2d at 580-82.

Returning to our case, the district court relied heavily on *Kermoade* in determining that Tatum was illegally seized. Although the district court found the initial encounter was voluntary, the district court concluded that under the totality of the circum-

stances, the agents did not have a lawful basis to *continue* questioning Tatum after he initially denied any knowledge of illegal drug activity. The district court reasoned that the agents had little or no evidence of criminal activity and no disinterested magistrate would have authorized a search warrant based on the information available to the agents before they approached Tatum's residence. The district court noted it had been over 1 year since Skelton observed Tatum purchase the fertilizer from the store under surveillance. The KBI's investigation of Tatum's residence during that year had revealed no material evidence. The district court found that Skelton's observations of the air conditioner and the clay balls were insignificant because the items had a legitimate use as well as an illegal one. Finally, the district court reasoned that the agents' initial conversation with Tatum on the front porch did not give rise to reasonable suspicion of criminal activity.

The State argues the district court's legal determination that the voluntary encounter turned into an illegal seizure was erroneous. The State reasons that the district court incorrectly focused on the agents' lack of evidence of drug activity and whether reasonable suspicion of criminal activity existed to continue questioning Tatum, which is not required for consensual encounters. The State argues that the district court should have focused on whether a reasonable person in Tatum's situation would have felt free to decline the agents' requests or otherwise terminate the encounter.

We find the State's argument persuasive. Review of the district court's memorandum decision suggests that the district court skipped a step in its analysis by determining whether the encounter between Tatum and the agents was an illegal seizure before determining if the encounter was in fact a seizure. In *Kermoade,* the court first determined that a seizure had in fact occurred because a reasonable person in the defendants' situation would not have felt free to disregard the officers' demands. Only *after* making this initial determination did the *Kermoade* court consider whether the officers had reasonable suspicion of criminal activity to detain the defendants. 33 Kan. App. 2d at 588.

Essentially, the district court determined that Tatum was illegally seized because the agents lacked reasonable suspicion of crim-

inal activity to detain Tatum after he initially denied any knowledge of illegal drug activity. However, the district court failed to evaluate whether Tatum was seized in the first place. As long as Tatum's encounter with the agents remained consensual, there was no requirement for reasonable suspicion of criminal activity in order for the agents to continue their questioning. A voluntary encounter is not considered a seizure and does not require a law enforcement officer to have reasonable suspicion of criminal activity. *Young,* 37 Kan. App. 2d at 704.

The facts of this case fall somewhere between the defendant's immediate cooperation with officers in *Dwyer* and the persistent drawn out process to obtain consent in *Kermoade*. However, this case is clearly distinguishable from *Kermoade,* relied on by the district court. Although Tatum initially denied any knowledge of illegal drug activity, Tatum never informed the agents that he did not want them in his home, as the woman did in *Kermoade*. Unlike the woman in *Kermoade,* Tatum did not go back into his house and then receive an order to return to the door. Furthermore, the agents did not threaten to secure Tatum's residence to obtain a search warrant, as the officers did in *Kermoade*. Tatum's encounter with the agents lasted 5 to 10 minutes as opposed to the 30-minute encounter in *Kermoade*. During the conversation, Tatum was never physically detained or handcuffed, the agents never yelled or raised their voices, no threats were made, no weapons were drawn, and the tone was pleasant and conversational.

We conclude that the district court's legal determination that the voluntary encounter turned into an illegal seizure was erroneous. Under the totality of the circumstances, a reasonable person in Tatum's situation would have felt free to decline the agents' requests or otherwise terminate the encounter. See *Thompson,* 284 Kan. at 775. The agents' continued conversation with Tatum following his single denial of illegal drug activity was insufficient for the district court to determine that the voluntary encounter with Tatum transformed into a seizure. See *United States v. Woodward,* 873 F. Supp. 535 (D. Kan. 1994) (10-minute knock and talk on porch based on anonymous tip of drug activity was not a seizure even when defendant initially denied drug activity where officers

were in plain clothes, did not display weapons, and did not touch or physically restrain defendant).

The final question to be decided is whether Tatum's consent to search his residence was voluntary. The State bears the burden of showing that Tatum's consent to search was freely and voluntarily given. The Kansas Supreme Court has stated that voluntariness of a consent to search is a question of fact to be determined from all the circumstances. *State v. Moore,* 283 Kan. 344, 360, 154 P.3d 1 (2007). For a consent to search to be valid, there must be clear and positive testimony that the consent was unequivocal, specific, and freely given without duress or coercion, express or implied. *Thompson,* 284 Kan. at 776. An appellate court reviews the district court's determination of the voluntariness of a consent to search for substantial competent evidence. *Moore,* 283 Kan. at 360.

Many of the factors that are relevant in determining whether the encounter between Tatum and the agents was consensual are also relevant in determining the voluntariness of Tatum's consent to search. The evidence that the agents were in plain clothes, did not display weapons, used a conversational tone, did not threaten or touch Tatum, and assured him he was not going to jail and that the conversation lasted only 5 to 10 minutes clearly supports a conclusion that Tatum's consent to the search was voluntary. At the conclusion of the search, Tatum acknowledged to Skelton that he did not feel threatened or coerced and he thanked the agents for their professionalism.

Tatum claims that he was tricked into giving consent because the agents gave a false impression that they possessed reliable evidence that Tatum was growing marijuana. However, as the district court noted, a bluff or a misrepresentation as to the amount of evidence that law enforcement officers have against an individual will not render involuntary an otherwise voluntary consent. See *State v. Wakefield,* 267 Kan. 116, 127, 977 P.2d 941 (1999). Tatum also denied that the agents informed him that he did not have to consent to the search. The agents contradicted Tatum's testimony in this respect. The district court did not resolve this factual dispute and indicated the "discrepancy [was] not dispositive." Although it would have been better for the district court to make a specific

finding of fact, the district court's failure to do so was not fatal. Even if the district court believed Tatum's testimony that the agents never informed him he did not have to consent to the search, this is only one factor to consider in the totality of the circumstances as to whether the consent was voluntary. As the district court noted, knowledge of the right to refuse consent is not required for a finding of voluntariness. *State v. Holmes*, 278 Kan. 603, 611, 102 P.3d 406 (2004).

The district court's determination that Tatum knowingly and voluntarily consented to the search of his residence was supported by substantial competent evidence, even though some evidence may have supported a different conclusion. The district court also concluded that Tatum's consent purged the taint of the illegal seizure. We do not need to reach this issue based on our conclusion that there was never an illegal seizure. The judgment of the district court will be upheld on appeal if it is correct for any reason. See *State v. Murray*, 285 Kan. 503, 533, 174 P.3d 407 (2008). For these reasons, we conclude the district court did not err in denying Tatum's motion to suppress the evidence.

Affirmed.